454 P.2d 976

STATE of Arizona, Appellee,

v.

Paul Melvin EVANS, Appellant.

No. 1928.

Supreme Court of Arizona.

In Banc.

May 28, 1969.

Gary K. Nelson, Atty. Gen., Carl Waag, Special Asst. Atty. Gen., Phoenix, for appellee.

William T. Healy, Tucson, for appellant.

LOCKWOOD, Vice Chief Justice:

Defendant Paul Melvin Evans was convicted of second degree rape in violation of A.R.S. § 13-611 and sentenced to from three years to life. From this conviction and sentence defendant appeals.

Shortly after noon on January 14, 1967, the victim, aged five, and her friend, "Jackie", aged ten, left their homes in Rolling Hills, a Tucson subdivision, for a picnic in the nearby desert. They had just finished their lunch when they were approached by defendant in his automobile. Defendant said that his dog had wandered away and asked if they would like to help him look for it. The girls assented, and the three began walking through the desert. After searching for the dog a short time, defendant suggested that Jackie "circle around" on her own, and he would stay with the victim. Jackie left for about five minutes, returned, and then left again to continue searching. This procedure was repeated four times, and it was during one of Jackie's absences that the alleged offense occurred.

Subsequent to his preliminary hearing on January 25, 1967, defendant filed a motion for a hearing under Rule 250, Rules of Criminal Procedure, 17 A.R.S. in order to determine whether he was able to assist in his defense and as a result of this hearing was committed on February 11, 1967, to the Arizona State Hospital in Phoenix. On March 31, 1967, Dr. Harrison Baker, the psychiatrist in charge of the Maximum Security Section of the State Hospital, certified that defendant was at that time capable of standing trial.

At the trial Dr. Baker testified for the state in regard to defendant's sanity. Based on his interviews with defendant during his period of commitment, Dr. Baker concluded that defendant at the time of the crime knew the nature and quality of his act and knew that it was wrong. Defendant objected to Dr. Baker's testimony concerning his mental condition on the ground that any communications made to Dr. Baker while defendant was in the State Hospital were privileged.

The general rule is that a physician-patient privilege does not arise when the defendant is being examined at the instance of the court or the prosecutor for the purpose of determining his mental or physical condition. People v. English, 31 Ill.2d 301, 201 N.E.2d 455 (1964); State v. Riggle, 76 Wyo. 1, 298 P.2d 349, 300 P.2d 567 (1956); Taylor v. United States, 95 U.S.App.D.C. 373, 222 F.2d 398 (1955). Defendant was ordered to the State Hospital as a result of a Rule 250 hearing to determine his ability to understand the proceedings and assist his counsel at the pending trial. Although there is some evidence in the record that Dr. Baker prescribed tranquilizers to alleviate defendant's nervousness and anxiety, we believe the evidence indicates that Dr. Baker functioned primarily as an examiner and not a therapist. While such facts would generally lead to a conclusion that no physician-patient privilege existed, we are, nevertheless, reluctant to hold that Dr. Baker should have been allowed to testify to certain statements made to him by the defendant in the course of the examination concerning the alleged criminal act. The following testimony was elicited by the state on direct examination:

"Q. Doctor Baker, during the course of these interviews that you had with Mr. Evans did you have the feeling or did he tell you specifically the crime with which he was charged and when it occurred and the different particulars about it?

"A. *The only thing he told me specifically was that he had committed the act involving a five-year old girl* and he had previously been aware of this being a problem with him not only by virtue of his being preoccupied with these thoughts on the one hand but *he also told me that*

*he had been reprimanded by the police and advised not to get into close contact with young children."* (Emphasis added.)

█ The obvious policy underlying the physician-patient privilege is that patients should be encouraged to make full and frank disclosures to those who are attending them. While we do not believe that allowing Dr. Baker to testify about his conclusions concerning defendant's sanity derogates from this policy, we do think that to permit even a psychiatrist acting for the court to transmit a defendant's incriminating statements to a jury is fundamentally unfair. In Lisenba v. People, 314 U.S. 219, 62 S.Ct. 280, 86 L.Ed. 166 (1941), Justice Roberts stated: "The aim of the requirement of due process is * * * to prevent fundamental unfairness in the use of evidence whether true or false." 314 U.S. at 236, 62 S.Ct. at 290.

█ This view of the law finds support in A.R.S. § 13–1621 which sets out the procedures to be followed when defendant raises the issue of insanity and provides in pertinent part:

> "In any of these proceedings, both the defendant and the state shall have the right to have the defendant examined by psychiatrists appointed by the court for the purpose of presenting testimony at any appropriate hearing. *Information obtained from defendant under these provisions shall not be used against him at any trial in which his guilt or innocence is to be determined unless the defendant consents."* (Emphasis added.)

Although this statute was not in effect at the time of defendant's trial, we cite it to show present legislative intent to construct a limited physician-patient privilege in a situation where, for the most part, none had previously existed. We believe that insulating a defendant from the possibility that an examining psychiatrist will repeat on the stand defendant's "confession" to him or other damaging admissions will promote the free interplay between patient and physician which is essential to obtaining a clear picture of defendant's mental health. We therefore hold that the above quoted testimony of Dr. Baker falls within the limited physician-patient privilege which is the present policy of this state as embodied in A.R.S. § 13–1621, and its admission constituted reversible error.

Although the case must be remanded for a new trial, we believe it worthwhile to comment briefly on some of the other points raised by defendant in order to guide the trial court in its rulings should these questions arise again.

Defendant maintains that Jackie, Deputy Czech, and the victim's mother should not have been permitted to relate conversations that they had with the victim, because such testimony was hearsay. The state counters with the argument that this testimony was admissible under the "spontaneous declaration" or "excited utterance" exception to the hearsay rule. In Soto v. Territory, 12 Ariz. 36, 94 P. 1104 (1908), this Court laid down the test for determining the admissibility of such statements:

> "* * * to render such statements or declarations admissible the circumstances must be such as naturally to produce such shock or nervous excitement as to render the utterance spontaneous and unreflective, and it must have been uttered while such shock or nervous excitement may be supposed still to dominate and control and keep in abeyance the reflective powers of the person who made it. It follows that such utterance or statement under this rule need not be shown to be contemporaneous with the event which called it forth, provided there has not been time for the exciting influence to lose its effect. As to the limit of time within which the exciting cause should be held to have been so dissipated, as to render such statement inadmissible, no rule may be formulated. Each case must depend upon its own facts and much must be left to the sound discretion of the trial court." 12 Ariz. at 39, 94 P. at 1105.

See also State v. Boodry, 96 Ariz. 259, 394 P.2d 196 (1964); State v. Owen, 94 Ariz. 404, 385 P.2d 700 (1963) reversed on other grounds, 378 U.S. 574, 84 S.Ct. 1932, 12 L.Ed.2d 1041 (1963); State v. McLain, 74 Ariz. 132, 245 P.2d 278 (1952); and Keefe v. Arizona, 50 Ariz. 293, 72 P.2d 425 (1937).

■■ Viewing the facts of this case in light of the pronouncement in Soto, *supra,* we hold that testimony of the victim's declarations to Jackie, Deputy Czech, and the victim's mother was admissible as an exception to the hearsay rule. The incident occurred sometime between twelve and three in the afternoon. The victim's declaration to Jackie was made prior to three o'clock, the conversation with Deputy Czech occurred shortly after four o'clock, and the victim told the story to her mother somewhere between five and six o'clock. The declarations need not be exactly contemporaneous with the exciting event that gives rise to them. As this Court observed in Soto, *supra:*

> "Where the victim of an assault is of an age to render it improbable that his utterance was deliberate and its effect premeditated in any degree, we do not think it is required that such utterance to be admissible as evidence shall have been so nearly contemporaneous with the event which gave rise to it as in the case of an older person * * *." 12 Ariz. at 40, 94 P. at 1105.

See also McLain, *supra;* Heflin v. State, 161 Tex.Cr.R. 41, 274 S.W.2d 681 (1955). We believe that the victim's declarations to these three people can be viewed as products of the continuing excitement caused by her recent shocking experience.

At his second preliminary hearing on June 21, 1967, defendant objected to the proceedings arguing that since he was committed to the hospital pursuant to a court order, another court order should be required before he could be compelled to stand trial.

Rule 250 provides in pertinent part:

> "B. If the court, after the hearing * * * decides that the defendant through insanity or mental deficiency is not able to understand the proceedings or assist in his defense, it shall have the defendant committed to the institution authorized to receive him. * * * If thereafter the authorized officer of such institution is of the opinion that the defendant is able to understand the proceedings and to assist in his defense, he shall report such fact to the court which conducted the hearing. If the officer so reports, the court shall proceed with the trial * * *."

■ In State v. Bradley, 102 Ariz. 482, 433 P.2d 273 (1967), the issue of the necessity of a second competency hearing was squarely before this Court. There we stated:

> "The prior adjudication of mental incompetency gives rise to a rebuttable presumption of continued incompetency. We hold that where evidence of restoration to competency, i. e. the report of the Arizona State Hospital certifying to defendant's competency to stand trial, is accepted as satisfactory by counsel for the accused, the prosecution, and by the court on the basis of the record before it, the presumption is outweighed, and the court should proceed to trial without further determination * * *. On the other hand, where the evidence before the court raises substantial doubts of competency at the time of trial or plea, a hearing should be held and a determination made." 102 Ariz. at 487, 433 P.2d at 278.

In Bradley we held that failure to order a second competency hearing was reversible error where the defendant's attorney filed an affidavit controverting the certificate issued by the State Hospital. In the present case at the commencement of the preliminary hearing defense counsel simply introduced a motion for a second competency hearing without accompanying affidavits or any other documents to controvert the State Hospital's certification. On these facts we hold that defendant failed to raise the "substantial doubts of his competency"

**438**

required by the Bradley case in order to justify a second hearing.

On the night defendant was arrested he was interrogated by John Rock, a detective with the Pima County Sheriff's Office. In the course of this conversation defendant admitted that he had assaulted the victim. Prior to the interrogation and prior to any statements by defendant, the officers had warned him of his constitutional right to remain silent, have the assistance of counsel, etc. Defendant specifically stated that he understood his rights and that he would answer the officer's questions. Defendant now contends that these statements should have been excluded since he did not make a knowing and intelligent waiver of his rights. He argues that his mental condition at the time he made these statements forecloses the possibility of an intelligent waiver.

Although approximately three weeks after the alleged confession the defendant was committed to the State Hospital because the court had reason to believe he was unable to assist in his own defense, we nevertheless believe that the medical testimony was sufficient to sustain a finding that the defendant had the mental capacity to make the simple decision as to whether he would answer the officer's questions or whether he desired the assistance of an attorney. One of defendant's own psychiatrists testified to this effect during the voluntariness hearing held by the Court.

BY THE COURT:

"Q. Doctor, based on your examination of the patient would you have any opinion as to whether or not he would understand if someone explained it to him that he had a right to counsel and not to say anything and make a voluntary statement, or would he be mentally incapable of doing so? Can you give me an opinion on that or not?

"A. I can give you an opinion, Your Honor. I think if it was put in simple enough terms he would understand. If someone said to him, 'Now, you have a right to have a lawyer before you answer any questions, do you want to have a lawyer, if you can't afford one we'll have one appointed for you, or we'll get one for you,' it would have to be very simple language but I'm sure he could comprehend."

In light of this testimony we hold that it was not error for the court to admit defendant's statements.

Reversed and remanded.

UDALL, C. J., and STRUCKMEYER, McFARLAND and HAYS, JJ., concurring.