471 P.2d 715

**STATE of Arizona, Appellee,**

v.

**Robert SHAW, Appellant.**

**No. 2088.**

Supreme Court of Arizona,
In Banc.

June 18, 1970.

Rehearing Denied July 14, 1970.

Gary K. Nelson, Atty. Gen., by Carl Waag, Asst. Atty. Gen., for appellee.

Waterfall, Economidis, Falk & Caldwell, by Peter Economidis, Tucson, for appellant.

McFARLAND, Justice.

Appellant Robert Henry Shaw—hereinafter called the defendant—was found guilty of the crime of robbery and sentenced to not less than six nor more than ten years in the Arizona State Prison. From this judgment and sentence he appeals.

Defendant was charged with the robbery on January 2, 1969, of the Community Finance Company, located at 3950 East Speedway, Tucson, Arizona. On January 3, 1969, defendant was arrested, a criminal complaint filed against him, and a preliminary hearing set for January 14, 1969. At the date set for the hearing defendant was confined in the psychiatric section of the Pima County Hospital following an attempt by him to take his own life by slashing his wrists.

A Pima County welfare worker filed a petition for civil commitment, and a hearing determined that the defendant should be hospitalized.

On January 17, 1969, a motion for mental examination and for immediate hearing was filed, pursuant to the provisions of § 13-1621, A.R.S., and two doctors testified that the defendant was suffering from a mental illness which rendered him unable to understand the nature of the proceedings against him or to assist counsel in his defense. Defendant was accordingly committed to the Arizona State Hospital until such time as it was found that he was capable of understanding and could assist with his own defense.

On April 18, 1969, the defendant was returned to the Superior Court of Pima County to stand trial on the offense. On April 23, 1969, a second motion for mental examination was filed on behalf of the defendant, and a hearing was held May 14, 1969. At this hearing, Doctor Treptow and Doctor Van Antwerp testified that Robert Shaw was able to understand the nature of the proceedings against him and to assist counsel in his defense, and the court ordered that a preliminary hearing be held immediately. The defendant was bound over at the preliminary hearing and arraigned on June 10, 1969, at which time a plea of not guilty was entered.

On July 17, 1969, notice was filed by defendant that he intended to establish at his trial that he was insane or mentally defective at the time the alleged robbery was committed. Pursuant to the procedures set out in § 13-1621.01, A.R.S., separate trials were held—first on the issue of guilt or innocence, and the second on the question of the defendant's sanity. The defendant was found guilty at the first trial, and at the second he was found to be sane at the time the act was committed.

Defendant contends that five errors were made during course of his trial.

He first contends that the trial court committed error in admitting—over objection of the defense—certain statements made to Dr. Carl S. Wellish, staff psychiatrist at the Arizona State Hospital, who interviewed defendant during the time defendant was confined in the State Hospital.

Defendant asserts that these statements were privileged and not admissible under § 13–1802, A.R.S., which states:

"A person shall not be examined as a witness in the following cases:

\* \* \* \* \* \*

"4. A physician or surgeon, without consent of his patient, as to any information acquired in attending the patient which was necessary to enable him to prescribe or act for the patient. As amended Laws 1961, Ch. 36, § 1."

 We feel that we must agree with defendant's position that the admission of the testimony of Dr. Wellish, with regard to certain acts related to him by the defendant while Dr. Wellish examined him, was prejudicial error by the court.

In State v. Evans, 104 Ariz. 434, 454 P. 2d 976, tried before the adoption of § 13–1621.01, A.R.S., we held:

"The general rule is that a physician-patient privilege does not arise when the defendant is being examined at the instance of the court or the prosecutor for the purpose of determining his mental or physical condition. People v. English, 31 Ill.2d 301, 201 N.E.2d 455 (1964); State v. Riggle, 76 Wyo. 1, 298 P.2d 349, 300 P.2d 567 (1956); Taylor v. United States, 95 U.S.App.D.C. 373, 222 F.2d 398 (1955). Defendant was ordered to the State Hospital as a result of a Rule 250 hearing to determine his ability to understand the proceedings and assist his counsel at the pending trial. Although there is some evidence in the record that Dr. Baker prescribed tranquilizers to alleviate defendant's nervousness and anxiety, we believe the evidence indicates that Dr. Baker functioned primarily as an examiner and not

a therapist. While such facts would generally lead to a conclusion that no physician-patient privilege existed, we are, nevertheless, reluctant to hold that Dr. Baker should have been allowed to testify to certain statements made to him by the defendant in the course of the examination concerning the alleged criminal act. \* \* \*

\* \* \* \* \* \*

"The obvious policy underlying the physician-patient privilege is that patients should be encouraged to make full and frank disclosures to those who are attending them. While we do not believe that allowing Dr. Baker to testify about his conclusions concerning defendant's sanity derogates from this policy, we do think that to permit even a psychiatrist acting for the court to transmit a defendant's incriminating statements to a jury is fundamentally unfair. \* \* \*

\* \* \* \* \* \*

"This view of the law finds support in A.R.S. § 13–1621 which sets out the procedures to be followed when defendant raises the issue of insanity and provides in pertinent part:

" 'In any of these proceedings, both the defendant and the state shall have the right to have the defendant examined by psychiatrists appointed by the court for the purpose of presenting testimony at any appropriate hearing. *Information obtained from defendant under these provisions shall not be used against him at any trial in which his guilt or innocence is to be determined unless the defendant consents.*' (Emphasis added.)

"Although this statute was not in effect at the time of defendant's trial, we cite it to show present legislative intent to construct a limited physician-patient privilege in a situation where, for the most part, none had previously existed. We believe that insulating a defendant from the possibility that an examining psychiatrist will repeat on the stand defendant's 'confession' to him or other damaging admissions will promote the

free interplay between patient and physician which is essential to obtaining a clear picture of defendant's mental health. We therefore hold that the above quoted testimony of Dr. Baker falls within the limited physician-patient privilege which is the present policy of this state as embodied in A.R.S. § 13–1621, and its admission constituted reversible error."

The statute itself as it presently exists and interpreted by State v. Evans, supra, would prevent the use of statements made by defendant to Dr. Wellish in the trial against him for the determination of his guilt or innocence. Should there be any distinction in the second trial in which he has pled not guilty by reason of insanity as to the admission of testimony of the doctor as to statements made by the defendant to him which would tend to show that he remembered the commission of the act? The test of legal insanity, as held by this Court, has two elements—

"(1) Such a defect of reason as not to know the nature and quality of the act, or

"(2) If he did know, that he did not know he was doing what was wrong." State v. Schantz, 98 Ariz. 200, 207, 403 P.2d 521, 525, cert. den., 382 U.S. 1015, 86 S.Ct. 628, 15 L.Ed.2d 530.

The doctor's testimony in regard to the acts related by the defendant to him would have a bearing upon the guilt by reason of insanity under this test just as it did upon the commission of the act itself, for the reason that it would tend to show that he understood the nature and quality of the act at the time of its commission. A defendant—if he knew this—would have a tendency not to confide in the physician, and a psychiatrist would be handicapped in the treatment of the patient. The purpose of the privilege would thereby be defeated.

A patient committed to the Arizona State Hospital under the circumstances of the instant case should have the same privilege as a patient under treatment by a physician in a private hospital. The act does not recognize any distinction. The test is whether a physician-patient relationship exists. State v. Sullivan, 60 Wash.2d 214, 373 P.2d 474. If a patient is examined believing that the purpose of the examination is for treatment then the patient has a right to rely upon the confidence imposed in the physician. Any other holding would permit the privilege accorded the patient to be taken from him by trick or fraud.

It is clear in the instant case that treatment, not observation alone, was included in the purposes for which defendant was held in the State Hospital. This is clearly indicated by the nature of Dr. Wellish's testimony, as follows:

"Q Doctor Wellish, Mr. Wilkes asked you a question the purpose of this examination. Was one of the purposes of your examination on March 26, 1969 the treatment of the patient, Robert Shaw?

"A If treatment was indicated, yes.

"Q Whatever occurred and the information obtained at that time ultimately would be used in any treatment he received while a patient at the Arizona State Hospital?

"A That is correct."

In Taylor v. United States, 95 U.S.App. D.C. 373, 222 F.2d 398, the court held:

" 'In the courts of the District of Columbia no physician or surgeon shall be permitted, without the consent of the person afflicted, or of his legal representative, to disclose any information, confidential in its nature, which he shall have acquired in attending a patient in a professional capacity and which was necessary to enable him to act in that capacity * * *.' D.C.Code 1951, § 14–308, 29 Stat. 138. ' "The local statute is very broad. It forbids disclosure by the physician of any information obtained by him in his professional capacity." ' Sher v. De Haven, 91 U.S.App.D.C. 257, 260, 199 F.2d 777, 780, 36 A.L.R.2d 937, certiorari denied, 345 U.S. 936, 73 S.Ct. 797, 97 L.Ed. 1363.

"In regard to mental patients, the policy behind such a statute is particularly clear and strong. Many physical ailments might be treated with some degree of effectiveness by a doctor whom the patient did not trust, but a psychiatrist must have his patient's confidence or he cannot help him. 'The psychiatric patient confides more utterly than anyone else in the world. He exposes to the therapist not only what his words directly express; he lays bare his entire self, his dreams, his fantasies, his sins, and his shame. Most patients who undergo psychotherapy know that this is what will be expected of them, and that they cannot get help except on that condition. * * * It would be too much to expect them to do so if they knew that all they say—and all that the psychiatrist learns from what they say—may be revealed to the whole world from a witness stand.'

" 'Presumably all of the patients in any good mental hospital are receiving psychiatric treatment. That is true of persons whether they are sent to St. Elizabeths Hospital as civil insane, as criminal insane, or as "sexual psychopaths." '

\* \* \* \* \* \*

"The cases on which the government relies do not support its position. They hold that a doctor who does not treat a prisoner, but only examines him in order to testify about his condition, may testify about it. Of course he may. Examination for testimonial purposes only has nothing to do with treatment. A doctor who makes such an examination is not 'attending a patient'. There is no confidential relation between them. Instead of implying that confidence will be respected, the circumstances imply the contrary. It is a far cry from such cases to the government's contention that a psychiatrist who treats a patient charged with crime may expose the man's secrets to a jury despite a statute that expressly excludes information 'acquired in attending a patient.' The statute does not say or imply that the privilege it creates may be withheld from patients who have been committed to a public mental hospital. Most courts that have considered the matter hold, as we do, that such patients are entitled to the protection of such a statute."

In the Taylor case, supra, the defendant was charged with robbery, housebreaking, and grand larceny. The District of Columbia had, at that time, a statute similar to ours. While we are aware that some jurisdictions do not follow this rule in criminal cases [1], we feel that it is the better and more just rule, and, since our statute does not exclude criminal cases from the privilege, we hold that allowing the doctor's testimony regarding specific acts was reversible error, and the testimony of Dr. Wellish was improperly admitted in evidence.

We accordingly hold that the admission of this testimony requires a new trial. This, then, presents the question of the procedure to be followed. The defendant raised the question of the constitutionality of the procedure set forth in § 13–1621.01, A.R.S., stating that "the procedures outlined in the statute might produce a foreseen and undesirable substantive effect." The principal argument presented by the defendant was that the procedure was unconstitutional in that the Arizona statutes vest in the Arizona Supreme Court the exclusive power to make rules relative to all procedural matters in any court of the State. As admitted in defendant's reply brief, this was passed on in State v. Blazak, 105 Ariz. 216, 462 P.2d 84, in which we held that, following the adoption of this constitutional provision in 1960, the power

---

1. State v. Campbell, 146 Mont. 251, 405 P.2d 978 (1965); State v. Dean, 69 Utah 268, 254 P. 142 (1927); People v. Gonzales, 132 Cal.App.2d 276, 5 Cal.Rptr. 920 (1960); State v. Betts, 235 Or. 127, 384 P.2d 198, 7 A.L.R.3d 1445 (1963); State v. Bounds, 74 Idaho 136, 258 P.2d 751 (1953); State v. Coburn, 82 Idaho 437, 354 P.2d 751 (1960).

to make procedural rules is now vested exclusively in this Court. However, we further held that:

"* * *, since new substantive rights are here created, and procedural rules of the statute are promulgated to supplement the new rights, we will apply the principle stated in Burney v. Lee, supra. That is, the statutory rules accompanying the newly created statutory rights shall be deemed to be rules of court and shall remain in effect as such until modified or suspended by rules promulgated by this Court pursuant to Art. 6, § 5 of the Arizona Constitution. To attempt to promulgate such rules hastily without the necessary study and deliberation to make them effective, might produce a less than satisfactory result."

However, in so holding, we did not pass upon the constitutional aspects of the statute which are raised by the facts in the instant case, and the difficulty of the procedure presented by the defendant in his brief—particularly calling attention to the presentation of "undesirable substantive effect." The "undesirable substantive effect" urged by the defendant is particularly presented in the instant case by the question as to what the remand by this Court would require. Would a new jury be empaneled to try the case, in which all of the evidence in regard to the commission of the crime as well as evidence pertaining to his sanity again be presented? Or should evidence be presented only pertaining to the defendant's sanity as involved in the "plea of not guilty by reason of insanity." This requires an examination of the procedure which was not passed upon in the case of State v. Blazak, supra.

The act itself[2] provides for two trials—

"B. The first trial shall determine the issue of guilt or innocence and, if appropriate, the degree of the crime."

No procedure is set forth for guidance in the determination of this issue. The second trial—

2. § 13–1621.01. Two trials where defense of not guilty by reason of insanity asserted.
A. In any case where the defense of not guilty by reason of insanity is asserted, two trials shall be set unless good cause for a single trial is shown.
B. The first trial shall determine the issue of guilt or innocence and, if appropriate, the degree of the crime. The multiple trial concept shall not affect the traditional burden of proof or the applicability of § 13–131. At the discretion of the court, the jury may be informed that there may be two trials and what issues will be decided at each.
C. If the defendant is found guilty at the first trial, there shall be a second trial following promptly after the first trial. At the second trial, the jury shall consider the defense of insanity and, if appropriate, the defendant's present mental condition with regard to commitment to a mental institution. The court may convene a separate hearing for the purpose of receiving evidence relevant to the issue of punishment, and at such hearing the punishment in capital cases shall be fixed.
D. At the second trial, the following interrogatories shall be submitted to the jury:

1. Was the defendant insane at the time the offense was committed?
2. If your answer to interrogatory No. 1 is affirmative, does the defendant's present mental condition justify commitment to an appropriate mental institution (to be released only after a determination by a jury that he is no longer a danger to himself or to others.)
E. In a separate hearing for the purpose of receiving evidence relevant to the issue of punishment the question to be answered is 'what punishment is to be fixed—life imprisonment ————? death ————?'
F. If the answer to interrogatory No. 1 is negative, the court shall sentence the defendant according to law and, in capital cases, in accordance with the answer to the question in subsection E.
G. If the answer to interrogatory No. 2 is negative, the court shall enter a judgment of not guilty by reason of insanity and release the defendant.
H. If the answer to interrogatory No. 2 is affirmative, the court shall enter a judgment of not guilty by reason of insanity and commit the defendant to an appropriate mental institution, making provisions for security.

"C. If the defendant is found guilty at the first trial, there shall be a second trial following promptly after the first trial. At the second trial, the jury shall consider the defense of insanity * * *."

To follow such procedure would mean that the court could not consider the evidence of insanity at the first trial. This is the only reasonable interpretation; otherwise, the procedure in the second trial would be duplication and redundant. Under "B" it is also provided that the multiple-trial concept shall not affect the traditional provisions of burden of proof, or § 13–131, A.R.S., which provides:

"In every crime or public offense there must exist a union or joint operation of act and intent, or criminal negligence. The intent or intention is manifested by the circumstances connected with the offense, and the sound mind and discretion of the accused. All persons are of sound mind who are neither idiots nor lunatics nor affected with insanity."

The bifurcated trial would require the jury to find the intent or the intention solely from the circumstances connected with the offense, as provided in § 13–131, A.R.S., and the question of sound mind would have to be presented at the second trial which gives rise to the question of whether this is due process of law—not only in regard to intent but also in the charge of murder, for example, in regard to the issues of premeditation and malice aforethought. If an individual is insane he would not be able to intend an act, nor would he be able to premeditate or have malice aforethought. Not only is there a question of due process of law, there is an additional question presented by a conflict in the law as to whether § 13–131, A.R.S., could be divided in the trial and made applicable partly to Paragraph B and partly to Paragraph C of § 13–1621.01, A.R.S.

Only three other States at the present time have provision for bifurcated trial—California, Colorado, and Texas. In the first case involving the question after the adoption of the California statute, People v. Troche, 206 Cal. 35, 273 P. 767, and following cases, the court, in passing upon the constitutionality of the statute, held that it was a mere procedural matter and that the act was constitutional. However, Justice Preston vigorously dissented from this view, stating:

"But the legal infirmities of these provisions are easily discerned. They undertake to subdivide an indivisible integer, and therein lies their chief infirmity. In other words, the plea of not guilty necessarily includes within it the element of insanity. This is true not because of any legislative fiat, but because sanity is a fundamental element of all amenableness to punishment and is the prime ingredient of the criminal legislation of all civilized countries. See Pen.Code, §§ 20, 21, 26. There can be no malice, deliberation, or premeditation without sanity. There can be no criminal intent—indeed, no criminal act—where there is no sanity. If the jury, in ascertaining the intent of the defendant, may not consider the evidence of his insanity, it must follow that the Legislature has the power to dispense entirely with the element of intent. Yes, more is true: If the jury may not, before assessing guilt to the defendant, consider the fact that he is insane, not only may criminal intent be dispensed with, but the time-honored and almost sacred presumption of innocence may be set at naught by the law-making power. See State v. Strassburg, 60 Wash. 106, 110 P. 1020, 32 L.R.A.,N.S., 1216, Ann.Cas.1912B, 917.

\* \* \* \* \* \*

"This court should be quick and decisive in its action to declare anew our Bill of Rights and to preserve the essential attributes of a jury trial as known to the common law and as preserved by our Constitution. Article 1, §§ 7 and 13, Const. These provisions are so obnoxious to the spirit of our institutions that the blood of Abel 'crieth from the ground' for vindication."

Then, when People v. Wells, 33 Cal.2d 330, 202 P.2d 53, cert. den. 338 U.S. 836, 70 S.Ct. 43, 94 L.Ed. 510, came along, the court was presented with the question of whether it was due process to require the jury to pass upon the requisite intent without permitting evidence of the capacity of the defendant to form an intent. So the court held that it was permissible to introduce evidence in regard to the defendant's capacity to form an intent in the first trial in regard to his guilt or innocence, and leave the question of insanity under the M'Naghten rule for the second trial. In so holding the court said:

"As a general rule, on the not guilty plea, evidence, otherwise competent, tending to show that the defendant, who at this stage is conclusively presumed sane, either *did* or *did not*, in committing the overt act, possess the specific essential mental state, is admissible, but evidence tending to show legal sanity or legal insanity is not admissible. Thus, if the proffered evidence tends to show not merely that he *did* or *did not*, but rather that because of legal insanity he *could* not, entertain the specific intent or other essential mental state, then that evidence is inadmissible under the not guilty plea and is admissible only on the trial on the plea of not guilty by reason of insanity."

In an article on the bifurcated trial in the California Law Review, it was stated:

"Reaching the result in the Wells case required some rather strenuous legal gymnastics. For one thing, it required the court to treat the term 'insanity' in the separate trial provisions of Penal Code sections 1016 and 1026 as having a different and narrower meaning than the same term as used in the general provision of section 26 of the Penal Code providing that 'insanity' renders a person incapable of crime. Moreover, attempting to adhere to the letter of the separate trial provision, the court ignored the reason that prompted its enactment: the desire to separate the issue of guilt from the issue of mental condition. Finally,

the court was required to lay down a rule of evidence of mental condition that seems incapable of predictable administration.

"The evidence rule is worth brief elaboration, for it was in the formulation of this rule that the court confronted the illogic of its position. It had to say that evidence of mental condition was admissible, but that evidence of 'insanity' was not. As an attempted reconciliation of these inconsistent objectives, the court stated the following:

[See court's statement quoted above.]

"Mr. Justice Carter in his dissenting opinion stated that this distinction is untenable, for as a matter of logic, any proof tending to show that a certain mental condition *could* not exist is relevant and should be admissible to show that it *did* not exist. And of course, proof that something could not exist is the best possible evidence that it did not exist. On this issue he stated:

" 'In my opinion [the rule announced by the majority and quoted above] * * * is unsound, wholly impractical to apply and will lead not only to absurd results but will tend to encourage perjury and the juggling of words by expert witnesses on the question of defendant's mental condition. It is unsound because it violates the fundamental principle that 'the greater contains the less.' (Civ.Code, § 3536.) If the accused's mentality at the time of the commission of the unlawful act was such that he could not distinguish between right and wrong—had no reasoning capacity at all, he could not have had a specific intent, premeditated or acted maliciously. Thus evidence of that condition would establish a total lack of intent, premeditation or malice—elements, the proof of which, is indispensable to establish guilt. It is strange reasoning to say that you may prove a partial mental quirk or disability to refute the presence of intent but cannot give evidence of a total mental aberration. This is equivalent to saying that

blindness in one eye will absolve a person from guilt, but that two sightless eyes will constitute no defense. Is this not a paradoxical absurdity?'

"To draw a line between evidence of mental condition admissible at the first trial, and that admissible only at the second trial, a line that is logically satisfactory and administratively feasible, is a herculean task. As a trial judge stated in a letter to the writers: 'But even if right, the Wells case is a Pyrrhic victory because it imposes upon both the trial and reviewing courts the impossible task of determining accurately what evidence is and is not admissible." [49 Cal.L.Rev. 805 (1961)]

The article then calls attention to the recommendation of the California Special Crime Study Commission on Criminal Law and Procedure, in its final report in 1949, in which the majority of the Commission recommended that the provision of the penal code requiring a plea of not guilty by reason of insanity be retained but that when such a plea and a plea of not guilty are both entered the issues raised by both shall be tried simultaneously.

In another article in the California Western Law Review on the developments since the Wells case, the "Gradual Decay" of the procedure in the bifurcated trial is discussed. In the final determination, the question is asked in the article "What Steps Should the Court Take to Solve the Dilemma?"

"IV. WHAT STEPS SHOULD THE COURT TAKE TO SOLVE THE DILEMMA?

"It seems that the court could take judicial action in at least three ways. First, the court could continue in the direction they are now moving—gradually picking away at the legal inconsistencies of the bifurcated trial system through procedural means such as in the Wells, Gorshen and Conley cases. The bifurcated trial system remains exactly the same, however, but the effect of it has been de-

feated by altering the rules of evidence to admit the very things that the system was enacted to restrict from admission. Second, it seems the court could not judicially abolish the bifurcated trial system on the grounds that it is a denial of due process where the system applied as it was originally intended. If the court enforced the operation of the system according to the true intent of the enactors, there would be little difficulty today in finding a denial of due process since it denies to the defense the right to disprove an essential element of the crime charged. Third, the court could change the test for insanity. The test is not one that has been enacted by statute so that the court is free to change the test if it chooses. * * *" [3 Cal. West.L.Rev. 159 (1967)]

Then, in the conclusion of the article, it is stated:

"The bifurcated trial system as it now stands, still appears to be fraught with the same basic legal infirmities which accompanied it at its inception. Such infirmities cannot be cured by the application of procedural remedies. * * *"

In Texas, the courts, in order to comply with the due-process test, permit the passing on the question of insanity—if requested by the defendant—before the trial on the guilty or innocence plea, and also permit it to be raised again at the trial on guilt. So, in this way, the Texas courts have avoided violating the due-process clause. And, in Colorado, the courts allow the question of mental capacity to be raised at the guilt-and-innocence trial.

Courts, in passing upon what constitutes due process, have generally not attempted to define in a few words what is meant by the term. In Rochin v. California, 342 U. S. 165, 72 S.Ct. 205, 96 L.Ed. 183, the court described due process as follows:

" * * * Regard for the requirements of the Due Process Clause 'inescapably imposes upon this Court an exercise of judgment upon the whole course of the proceedings [resulting in a conviction]

in order to ascertain whether they offend those canons of decency and fairness which express the notions of justice of English-speaking peoples even toward those charged with the most heinous offenses.' Malinski v. People of State of New York, supra, 324 U.S. [401] at pages 416–417, 65 S.Ct. [781] at page 789 [89 L.Ed. 1029, 1039]. These standards of justice are not authoritatively formulated anywhere as though they were specifics. Due process of law is a summarized constitutional guarantee of respect for those personal immunities which, as Mr. Justice Cardozo twice wrote for the Court, are 'so rooted in the traditions and conscience of our people as to be ranked as fundamental', Snyder v. Commonwealth of Massachusetts, 291 U.S. 97, 105, 54 S.Ct. 330, 332, 78 L.Ed. 674, [677] [90 A.L.R. 575], or are 'implicit in the concept of ordered liberty'. Palko v. State of Connecticut, 302 U.S. 319, 325, 58 S.Ct. 149, 152, 82 L.Ed. 288, [292].

A brief, more specific definition is:

"As applied to a criminal trial, denial of due process is the failure to observe that fundamental fairness essential to the very concept of justice. * * *" Lisenba v. California, 314 U.S. 219, 62 S.Ct. 280, 86 L.Ed. 166.

Can this Court say that it is just to pass upon the guilt and innocence of a defendant without allowing all of the evidence available to determine whether he had the mental capacity to commit the crime? The bifurcated trial has been fraught with conflicts and difficulty of administration wherever its use has been attempted. As pointed out in the California Western Law Review, the courts in California have gradually picked away at its legal inconsistencies, and in doing this the objectives have been defeated by altering the rules of evidence to admit the very things the system was enacted to restrict from admission —namely, the admission of evidence of insanity at the first trial. Texas and Colorado have adopted a cumbersome double-trial on the same issues in order to comply with due process. To prohibit the introduction of any or all the evidence bearing on proof of insanity at the trial of guilt or innocence would deprive a defendant of the opportunity of rebutting intent, premeditation, and malice, because an insane person could have none. The first trial then would involve only proof that an act of a criminal nature had been committed, and that the defendant committed it. In effect, this gives rise to a presumption of intent, premeditation, or malice which runs counter to the common-law and constitutional concepts of criminal law. The second trial is limited solely to the question of legal insanity, the guilt of the defendant having already been determined. There is no provision, nor realistically could there be, to determine also intent, premeditation, or malice in reduction of the degree of the crime. Thus, the presumption raised in the first trial becomes an irrebuttable presumption. Such a presumption is in violation of due process, as was pointed out in Morissette v. United States, 342 U.S. 246, 72 S. Ct. 240, 255, 96 L.Ed.2d 288:

"As we read the record, this case was tried on the theory that even if criminal intent were essential its presence (a) should be decided by the court (b) as a presumption of law, apparently conclusive, (c) predicated upon the isolated act of taking rather than upon all of the circumstances. In each of these respects we believe the trial court was in error.

"Where intent of the accused is an ingredient of the crime charged, its existence is a question of fact which must be submitted to the jury. State court authorities cited to the effect that intent is relevant in larcenous crimes are equally emphatic and uniform that it is a jury issue. The settles practice and its reason are well stated by Judge Andrews in People v. Flack, 125 N.Y. 324, 334, 26 N.E. 267, 270, 11 L.R.A. 807: 'It is alike the general rule of law, and the dictate of natural justice, that to constitute guilt there must be not only a wrongful act,

but a criminal intention. Under our system, (unless in exceptional cases,) both must be found by the jury to justify a conviction for crime. However clear the proof may be, or however incontrovertible may seem to the judge to be the inference of a criminal intention, the question of intent can never be ruled as a question of law, but must always be submitted to the jury. * * *

* * * * * *

"We think presumptive intent has no place in this case. A conclusive presumption which testimony could not overthrow would effectively eliminate intent as an ingredient of the offense. A presumption which would permit but not require the jury to assume intent from an isolated fact would prejudge a conclusion which the jury should reach of its own volition. A presumption which would permit the jury to make an assumption which all the evidence considered together does not logically establish would give to a proven fact an artificial and fictional effect. In either case, this presumption would conflict with the overriding presumption of innocence with which the law endows the accused and which extends to every element of the crime. Such incriminating presumptions are not to be improvised by the judiciary. Even congressional power to facilitate convictions by substituting presumptions for proof is not without limit. Tot v. United States, 319 U.S. 463, 63 S.Ct. 1241, 87 L.Ed. 1519."

For this Court to comply with due process, the statute would have to be interpreted as allowing admission of all the evidence at the first trial but to do this it emasculates the act in such a way that it would not be carrying out the purpose for which it was intended. The adoption of the reasonable interpretation of the act is a violation of due process, particularly since the lack of procedural due process adversely affects substantive rights to a fair trial.

"Procedural fairness, if not all that originally was meant by due process of law, is at least what it most uncompromisingly requires. Procedural due process is more elemental and less flexible than substantive due process. It yields less to the times, varies less with conditions, and defers much less to legislative judgment. Insofar as it is technical law, it must be a specialized responsibility within the competence of the judiciary on which they do not bend before political branches of the Government, as they should on matters of policy which compromise substantive law.

"If it be conceded that in some way this alien could be confined, does it matter what the procedure is? Only the untaught layman or the charlatan lawyer can answer that procedures matter not. Procedural fairness and regularity are of the indispensable essence of liberty. * * *" Shaughnessy v. Mezel, 345 U.S. 206, 224, 73 S.Ct. 625, 635, 97 L.Ed. 956 [dissenting opinion.]

■ We therefore accordingly hold that the act is in violation of due process as provided in our own State constitution and the Constitution of the United States. The procedure provided for prior to its adoption is hereby re-instated.

The judgment in both trials is set aside, and the case is remanded for further proceedings in accordance with this decision.

The defendant contends that the court erred in not holding a hearing outside the presence of the jury to determine whether the identification of the defendant by four witnesses was tainted by previous out-of-court identification procedures. The record is not clear as to the discussion in chambers between counsel and the court in regard to this matter; however, this question probably will not occur at the next trial because the court will undoubtedly follow State v. Dessureault, 104 Ariz. 380, 453 P.2d 951.

The other questions presented likewise will probably not occur at the new trial.

Judgment reserved and the case remanded.

LOCKWOOD, C. J., STRUCKMEYER, V. C. J., and UDALL, and HAYS, JJ., concur.