514 P.2d 283

**STATE of Arizona, Appellee,**

v.

**Waymond Gene SMALL, Appellant.**

**No. 1 CA–CR 510.**

Court of Appeals of Arizona,
Division 1,
Department B.
Sept. 27, 1973.

Gary K. Nelson, Atty. Gen., by Peter Van Orman, Asst. Atty. Gen., Phoenix, for appellee.

Ross P. Lee, Public Defender, Maricopa County, by James H. Kemper, Deputy Public Defender, Phoenix, for appellant.

## OPINION

JACOBSON, Chief Judge, Division 1.

Defendant Waymond A. Small was convicted of aggravated battery in violation of ARS §§ 13–241 and 13–245. He appeals his conviction.

The incident out of which the conviction arose occurred at the Maricopa County jail on August 16, 1971, the defendant being in jail at that time on other charges. The jailers determined that some inmates of the cell block in which the defendant was placed were in possession of materials prohibited by jail policy. A search was undertaken

to disclose these materials. The search proceeded without incident until the defendant's cell was reached. The defendant refused to leave his cell unless he was permitted to take with him a folder which he claimed contained legal papers. Deputy Sheriff Sylvis, who was in charge of the search, grabbed the defendant's arm and forced him back. The defendant told Deputy Sylvis that if he would release his arm that he would put the papers down. When this was done the defendant stood up and looked at Deputy Sylvis for a couple of seconds and then began hitting him. Four other deputies rapidly subdued him.

At trial defendant relied almost exclusively on the defense of insanity, and he presented three psychiatrists who supported this defense. On two separate occasions Small had been admitted to the Arizona State Hospital, once in connection with a previous case, and once in connection with his present case. Both admissions had been for the purpose of determining the defendant's competency to stand trial. In rebuttal, the state called Dr. Michael Cleary, the chief psychiatrist in charge of the maximum security division at the Arizona State Hospital. Dr. Cleary had examined the defendant during his two previous admittances to the State Hospital, and at trial he testified that in his professional opinion the defendant did not suffer from any sort of mental illness. He also testified as to incidents at the jail which Small had related to him during his examination as to Small's ability to understand the proceedings and to assist in his own defense.

During the trial Deputy Sheriffs Charles Ordell and Jim Haines were assigned to transport the defendant to and from his jail cell. While the deputies were transporting the defendant on a Friday afternoon after trial the defendant said, "Well, the nut doctors go on Monday." Deputy Ordell then asked Small, "How can you tell the difference between the doctors and the patients out at the State Hospital?" In a non-responsive answer Small then said, "Those [obscenity] shrinks, they'll believe any thing you tell them. All but Cleary.

You can't fool him because I've tried. He'll walk right up in your face and say, 'What's the matter with you, boy? What are you trying to pull?'" The defendant claims he had not been advised of his Miranda rights immediately prior to this conversation. Later at trial this testimony was admitted over defendant's objection.

The record shows that Deputy Haines had telephoned Deputy Ordell on the Friday evening after the defendant had made the incriminating statements. The two discussed what he had said and compared their recollections. Ordell then wrote down his recollection of the defendant's statement. Haines disclosed the information to the county attorney. The state called only Deputy Ordell on rebuttal. After a hearing as to the admissibility of the defendant's statements to the deputies the trial court ruled that they were admissible.

When the damaging testimony of Deputy Ordell was elicited at trial, defense counsel sought to impeach his credibility or show bias by cross-examining him about a prior incident in the jail with the defendant. The prosecution objected without stating a reason, and the trial court sustained the objection. Later in chambers, defense counsel made an offer of proof by the examination of Deputy Haines, showing that Haines and other deputies in the jail had been involved in a prior incident with the defendant in which a deputy was injured. This testimony revealed that the incident at which Haines had been present occurred as follows: Deputy Haines and three other deputies were assigned to move the defendant from his cell to a maximum security cell. Small was clutching two pencils and was crouched in a fighting stance when the deputies came to his cell. Small refused to leave the cell, and subsequently Haines and another deputy "maced" Small and then charged him in an effort to subdue him. In the course of events the other deputy, Deputy Dominguez, was stabbed in the scalp with the pencil point before Small was subdued with the assistance of two other deputies. Haines testified that Dominguez was a personal friend. He also testified

that he was concerned about the incident and implied that he had been upset and "uptight." Haines later returned to the cell that Small was then occupying and "fourpointed" him. After Small had been "fourpointed" with the assistance of another deputy, Haines asked the other deputy to leave the cell stating that he wanted to talk to Small. Then Haines testified:

". . . Waymond [defendant] started screaming I was going to kill him and I says [sic] 'Look. Just shut up. I want to talk to you.' So I went over and sat down and he quit yelling and I went over and sat down at the edge of his bunk and I told him, 'Waymond, you damn near killed Dominguez.' I said, 'That was entirely uncalled for. There was absolutely no reason for that.' And I said, 'Everyone has seen it. No one is going to forget it.' I said, 'And the next time that there is any trouble, you know, these guys aren't going to forget it and you're subject to getting hurt very bad .[sic].' I said, 'You understand that, don't you?'"

Defendant's counsel asked to be permitted to call Deputy Haines as an adverse witness and to elicit the testimony concerning the prior incident in the jail. The court denied both requests. Because of the trial court's ruling defense counsel stated that he would not call Deputy Haines. Subsequently the jury found the defendant to be guilty as charged.

Defendant first contends that the incriminating statements made by him were secured in violation of Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). We disagree.

■ While there can be little dispute that the defendant was in the custody of law enforcement officers, it was defendant who initiated the conversation. Officer Ordell's question, "How can you tell the difference between the doctors and the patients out at the State Hospital?" was completely unrelated to defendant's case and there appears to be no indication that this question was interrogation. It was

merely small talk which was initiated by the defendant. "Volunteered statements of any kind are not, barred by the Fifth Amendment and their admissibility is not affected by the holding of *Miranda*." State v. Kroupa, 16 Ariz.App. 254, 257, 492 P.2d 750, 753 (1972). Furthermore, where there is no interrogation and the defendant utters words which are self-incriminating, these words are not subject to the *Miranda* warnings. State v. Schindorff, 107 Ariz. 172, 175, 484 P.2d 4 (1971).

■ The defendant next raises the question as to whether the trial court improperly limited the cross-examination of Deputy Ordell. Upon cross-examination of Deputy Ordell the following occurred:

"Q. O.K. Have you ever had any trouble with Mr. Small whatsoever?

"A. I had one incident with him but I don't consider it was any trouble.

"Q. Is that when he got out of the men's side of the jail and got over to the women's side?"

At this point the prosecution objected without stating any ground. The defense counsel correctly stated that the inquiry was to impeach the credibility of the witness. Without stating its reason, the trial court sustained the objection. Defendant contends that such restriction of cross-examination was reversible error. We agree. As the Arizona Supreme Court has stated:

"While the trial court has discretion in matters such as this, the policy in this State, as in most jurisdictions, has always been to allow the broadest scope of cross-examination in order to meet the accused's right of confrontation. [Citations omitted].

*     *     *     *     *     *

"The jury has a right to know any fact which tends to show a witness is biased, prejudiced or hostile in passing on that witness' credibility." State v. Ramos, 108 Ariz. 36, 39, 492 P.2d 697, 700 (1972).

It cannot be doubted that the testimony by Deputy Ordell was extremely damning and cast serious doubt on the defendant's

only viable defense. If there was any reason for bias, motive or prejudice on behalf of this witness, defendant had the right to bring it to light. (*See* State v. Reynolds. 104 Ariz. 149, 449 P.2d 614 (1969); State v. Mangrum, 98 Ariz. 279, 403 P.2d 925 (1965); and Morris K. Udall, Arizona Law of Evidence, p. 68, § 45 (1960).) The trial court unduly restricted the defendant's right of cross-examination.

■■ The state asserts that, since the trial court gave no reason for its objection, if there be any valid reason for sustaining the objection we must uphold the conviction. The state asserts that the question is leading and therefore objectionable. While as a general rule leading questions are not permissible during direct examination, such is not the case with cross-examination. We find nothing wrong with the form of the question.

■ We further hold, in the same vein, that defense counsel should have been allowed to examine Officer Haines, who appeared to be the moving force behind bringing defendant's statements to light, as to his motives in disclosing Small's statement and whether in fact a conspiracy existed among the jail personnel to improperly obtain a conviction of the defendant.

Since this matter must be retried, we comment upon one additional error claimed by the defendant. Defendant asserts that his physician-patient privilege was violated when the trial court admitted testimony by Dr. Cleary gained while defendant was admitted to the Arizona State Hospital pursuant to ARS § 13–1621 to determine his competence to stand trial.

Without regard to ARS § 13–1621 our Supreme Court of Arizona has determined the test for the physician-patient privilege:

"The test is whether a physician-patient relationship exists. [Citation omitted]. If a patient is examined believing that the purpose of the examination is for treatment [sic] then the patient has a right to rely upon the confidence imposed in the physician. Any other holding would permit the privilege accorded the patient to be taken from him by trick or fraud." State v. Shaw, 106 Ariz. 103, 106, 471 P.2d 715, 718 (1970).

However, where the examination by the doctor is not strictly for treatment but for the purpose of determining capacity to proceed with trial, ARS § 13–1621 has, in our opinion, expanded the traditional treatment aspects of the privilege by providing:

"In any of these proceedings [to determine the competency of the defendant to understand the proceedings and assist in his defense], both the defendant and the state shall have the right to have the defendant examined by psychiatrists appointed by the court for the purpose of presenting testimony at any appropriate hearing. *Information obtained from defendant under these provisions shall not be used against him at any trial in which his guilt or innocence is to be determined, unless the defendant consents."* (Emphasis added.)

In commenting on this statute the Arizona Supreme Court in State v. Evans, 104 Ariz. 434, 436, 454 P.2d 976, 978 (1969), held:

"Although this statute was not in effect at the time of defendant's trial, we cite it to show present legislative intent to construct a limited physician-patient privilege in a situation where, for the most part, none had previously existed."

It would appear that the case of *Shaw, supra,* is dispositive as to whether Dr. Cleary's testimony as to specific acts related to him in the course of his examination were admissible against the defendant on the issue of his guilt or innocence.

"The statute itself [ARS § 13–1621] as it presently exists and interpreted by State v. Evans, *supra,* would prevent the use of statements made by defendant to Dr. Wellish in the trial against him for the determination of his guilt or innocence" State v. Shaw, *supra,* 106 Ariz. at 106, 471 P.2d at 718.

The *Shaw* court went on to hold: "that allowing the doctor's testimony regarding

specific acts was reversible error . . .."
State v. Shaw, *supra* at 107, 471 P.2d at
719.

██ Defendant's trial was a trial to de-
termine guilt or innocence within the mean-
ing of ARS § 13–1621. Therefore, while
Dr. Cleary could testify as to the defend-
ant's sanity at the time of the incident, just
as any other expert witness, based upon his
examination, he should not testify as to
any specific acts related to him by the de-
fendant in the course of an ARS § 13–1621
examination. Since this case must be re-
versed we need not determine whether in
this case the violation of ARS § 13–1621
was reversible error in and of itself.

Accordingly, this case is reversed and re-
manded for a new trial.

EUBANK, P. J., and HAIRE, J., con-
cur.