569 P.2d 201

**STATE of Arizona, Appellee,**

v.

**Lupe Hernandez RAMIREZ, Appellant.**

No. 3428.

Supreme Court of Arizona,
En Banc.

July 21, 1977.

Bruce E. Babbitt, Atty. Gen. by Heather Sigworth, Asst. Atty. Gen., Phoenix, for appellee.

Stanfield, McCarville, Coxon, Cole & Fitzgibbons by A. Thomas Cole, Casa Grande, for appellant.

HAYS, Justice.

Appellant Lupe Ramirez was indicted and tried on an open charge of murder. On January 23, 1976, he was found guilty by a jury of murder in the first degree. From this conviction and a sentence of life imprisonment he appeals. We have jurisdiction pursuant to A.R.S. § 13–1711 and § 12–120.-21(A)(1).

He raises ten issues on appeal:

1. Did the prosecutor commit error during voir dire of the jury?
2. Did the prosecutor commit error by advising the jury that appellant had been indicted by the grand jury?
3. Did the "death-qualification" of the jury deprive him of his Sixth Amendment rights?
4. Was it error to admit the victim's statement?
5. Did appellant knowingly and intelligently waive his *Miranda* rights?
6. Was it error to admit appellant's threats to kill an unidentified third person?
7. Was error committed concerning the expert psychiatric testimony of Dr. Tuchler?
8. Were the prosecutor's closing remarks improper?
9. Did the court err in refusing a voluntary manslaughter instruction?
10. Did the court err in failing to consider time spent incarcerated prior to the imposition of sentence?

On August 14, 1975, Teresa Ramirez was shot and killed by her husband of 21 years, Lupe Ramirez, the appellant herein. In the weeks and months prior to the murder, the appellant and Teresa had been experiencing marital difficulties. Due to these problems the appellant decided to take a short vacation from both his wife and his job and traveled by himself to visit his brother in Texas. He returned in the morning of August 14, 1975, and brought with him from Texas a .38 Special pistol which he had left at his brother's the year before. On that morning, appellant, who had not drunk alcohol for five or six years, began drinking quite heavily and continued drinking throughout the day. At about 6:00 P.M. the appellant obtained a box of shells from his friend, Johnny Pena, and went "hunting" with Pena. Five shots were fired by Pena and thereafter the gun was reloaded. The two then returned via automobile to the appellant's house. No one was home so they left but returned a while later. The appellant, carrying the gun, entered the house while his friend remained outside unaware of what was transpiring. Finding his wife sitting at the kitchen table, the appellant approached her, said "Now you can't laugh at me anymore," and shot her four times, killing her. He then ran out and drove to another friend's house, dropping Mr. Pena off at the corner. He was found the next day at about 5:00 P.M. at a local bar, was given his rights and arrested.

Prior to trial, a Rule 11 competency hearing was ordered and psychiatric examinations were conducted. Appellant claimed repeatedly that he could not remember killing his wife and there was testimony that appellant had suffered from alcoholic amnesia on the day of the murder. The trial court determined that appellant was competent to stand trial. At trial, the defense did not attempt to rebut the facts as presented above but rather relied principally on an insanity defense premised on alcoholic amnesia.

Further facts will be developed as they become pertinent in our consideration of the issues enumerated above.

## I. VOIR DIRE OF JURY

Appellant first contends that the prosecution committed error during his voir dire of the jury in questioning the prospective jurors as follows:

"MR. HERAND: If the Court told all of you, instructed you at the close of the case that all witnesses are to be judged by the same standard regardless of race, profession, national origin, sex or religion, would you do as the Judge instructed you?

"If anybody feels they would not do as the Judge instructed, please let me know.

"Would you be able then to judge the defendant's testimony, *if he decided to take the witness stand,* with that same standard in mind.

"I take it from your silence then that you would apply the same standard to the defense witnesses as you would prosecution witnesses then." (emphasis added).

Appellant urges that the above-emphasized portion of the prosecutor's questioning

caused the jurors to speculate on whether the defendant would [actually] take the stand and further subtly pressure the appellant into testifying at trial, thereby constituting improper comment on his privilege not to testify.

■ In a criminal trial a defendant has the absolute right not to testify and to be free from comment on the exercise of that right. *State v. Whitaker,* 112 Ariz. 537, 544 P.2d 219 (1975). In support of his contentions that he was denied that right here, the appellant relies on *State v. Dessureault,* 104 Ariz. 380, 453 P.2d 951 (1969). In that case, the trial judge, *sua sponte,* inquired of the prospective jury during voir dire whether any of them would feel that the defendant, by not taking the stand, was trying to hide something. We found this questioning to be palpably erroneous because it not only "pointedly directed the attention of the jurors" to the fact that the defendant might not take the stand, but it also suggested to the jury that in the event the defendant chose not to take the stand, it was due to the fact that he indeed had something to hide.

■ The prosecutor's line of questioning here was hardly as egregious as that propounded in *Dessureault,* in that it neither underscored the appellant's privilege to choose not to testify nor otherwise inferred that a failure to take the stand was an admission of guilt. Taken out of context, the bare statement referring to the defendant's prospective testimony may not appear to have been proper and at the least, we perceive the remarks to be ill-advised. However, taking into consideration, as we must, the questioning both preceding and following the remark at issue, it is clear that his questions were merely directed towards ferreting out prejudices or biases the jurors may have had towards the defense or prosecution and in this context were quite innocuous. In short, we do not think that the prosecutor's questioning unduly focused the jury's attention on the appellant's privilege not to testify and we therefore do not think that his remarks constituted comment which would require reversal. At the time

the questioning occurred, defense counsel neither objected nor moved for a mistrial.

## II. PROSECUTOR'S STATEMENT CONCERNING THE INDICTMENT

The appellant argues that the prosecutor committed error in his opening statement by mentioning the fact that the appellant had been indicted by the Pinal County Grand Jury. We cannot agree.

■ First of all, we note that no objection was lodged by defense counsel below. Fundamental error aside, the failure to object to improper remarks of counsel during argument constitutes a waiver thereof. *State v. Wilson,* 113 Ariz. 308, 553 P.2d 235 (1976); *State v. Kelley,* 110 Ariz. 196, 516 P.2d 569 (1973). There being no objection below, the point cannot now be raised on appeal.

■ However, considering the merits of the appellant's argument, we find that in view of the cautionary instructions given the jury by the court, the prosecutor's comment was harmless. The court instructed the jury that the charge is not evidence against the defendant; that they, the jury, must not infer guilt merely because he was charged with the crime; and further that the comments and arguments of counsel are not evidence. We hold that the instructions given to the jury obviated any prejudicial effect that may have inhered due to the prosecutor's remark. *See United States v. Sutton,* 446 F.2d 916 (9th Cir. 1971), *cert. denied,* 404 U.S. 1025, 92 S.Ct. 699, 30 L.Ed.2d 675 (1972).

## III. EXCLUSION OF DEATH-SCRUPLED JURORS

■ The appellant maintains that the exclusion of three persons from the jury who objected to the death penalty denied him his right to a jury representative of the community and further that the practice of excluding the anti-death penalty jurors, stacked the jury with "prosecution-prone" people who implicitly are biased on the issue of guilt. In so arguing, the appellant

relies heavily on *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). In that case, the United States Supreme Court held that where all jurors opposed to the death penalty are systematically excluded, the jury's sentence of death is unconstitutional as it denies the defendant the right to an impartial jury. The Court, however, refused to find that the jury was not impartial on the issue of *guilt*, saying that the evidence was too "tentative and fragmentary to establish that jurors not opposed to the death penalty tend to favor the prosecution in the determination of guilt." 391 U.S. at 517, 88 S.Ct. at 1774. The appellant here, relying on several studies,[1] has made a commendable attempt to demonstrate that the exclusion of death-scrupled jurors does in fact result in an unrepresentative and prosecution-prone jury.

What the appellant fails to recognize, however, is that the jurors challenged in this case were not excluded as in *Witherspoon* simply because of their general moral aversion to the death penalty, which aversion may or may not have affected their objectivity on the issue of guilt. Rather, they were excused here because of their specific inability to separate their scruples on the matter of punishment from their duty to impartially decide the theoretically unrelated issue of guilt or innocence. In other words, even though the excluded veniremen recognized that the jury does not impose the sentence under Arizona law, they still felt that because of the possibility that the defendant may receive the death penalty, it would affect their vote on the issue of guilt and further their convictions on this matter were so strong that they would be unable to follow the court's instructions. Nothing in *Witherspoon* prohibits the exclusion of this type of juror and, in fact, the Court there intimated that the exclusion of jurors who could not be impartial on the issue of guilt was proper. *See* n. 21, 391 U.S. at 522, 88 S.Ct. at 1777.

Moreover, the studies propounded to this court by the appellant dealt only with jurors who had general conscientious objections against the death penalty and did not deal with the exclusion of veniremen who were unable to retain objectivity in view of the possible sentence of death. There is nothing in this case to indicate that the jury was thoroughly rid of generally scrupled jurors and so the studies proffered are inapposite.

We hold that the exclusion of these three jurors did not constitute error.

## IV. VICTIM'S STATEMENTS

■ The appellant complains that error was committed during the state's examination of a Mrs. Tapia who testified to a certain statement made by the victim within hours before her death. The appellant maintains that the victim's statement was inadmissible hearsay. The issue was first raised at the pretrial omnibus hearing where defense counsel sought a ruling on the admissibility of the following statement of the victim which counsel anticipated would be related at trial: "I'm afraid to go home. He is going to kill me." The trial court reserved ruling conclusively on the matter but did request counsel to refrain from eliciting this testimony in front of the jury until he had been given a further opportunity to decide the question.

At trial, Mrs. Tapia took the stand and was almost immediately asked by the prosecutor whether Teresa Ramirez said anything immediately before she left for home. Mrs. Tapia answered: "Yes. She said, 'Something is going to happen and I got to go home.'" At that point, defense counsel objected and the court immediately instructed the jury "to disregard that last comment, and just ignore it please." An off-the-record discussion was then held at the bench. When the proceedings resumed back on the record, the court again asked the jury to disregard and not consider the last statement.

---

1. The appellant relies principally on Zeisel, *Some Data on Juror Attitudes Towards Capital Punishment* (Center for Studies in Criminal Justice, University of Chicago Law School, 1968).

As stated earlier, the appellant argues on appeal that the statement of the victim, Teresa Ramirez, was rank hearsay and, as such, was inadmissible. He also argues that the court should have declared a mistrial based on the prosecutor's misconduct in asking Mrs. Tapia what was said. It is conceded by appellant that had a defense of accident, self-defense or suicide been interposed or had the identity of the killer been at issue, the victim's statements of fear would have been admissible under the state-of-mind exception to the hearsay rule. It is argued, however, that because none of those matters were in issue, the victim's statements were totally irrelevant, inadmissible hearsay and so prejudicial as to require reversal.

We agree that the victim's statement was inadmissible. While indeed the statement of the victim may have been indicative of her state of mind on the day she was murdered, and therefore was not excludable as hearsay, see State v. Izzo, 94 Ariz. 226, 383 P.2d 116 (1963), we cannot see how it was relevant to any of the issues in dispute at trial. The identity of the murderer was not in issue as in State v. Gause, 107 Ariz. 491, 489 P.2d 830 (1971), vacated on other grounds, 409 U.S. 815, 93 S.Ct. 192, 34 L.Ed.2d 71 (1972), because the appellant here, in effect, readily conceded that it was he who indeed pulled the trigger.

Unlike the situations in State v. Izzo, supra, where a defense of accident was interposed, or State v. Duke, 110 Ariz. 320, 518 P.2d 570 (1974), where the appellant claimed suicide, or People v. Atchley, 53 Cal.2d 160, 346 P.2d 764 (1959), where a claim of self-defense was raised, there were no material issues in dispute here in which the state of mind of the victim was relevant. That being so, Teresa's statement was not properly admissible.

Nonetheless, we do not think that the admission of the statement related by Mrs. Tapia was so prejudicial as to require reversal and retrial. First of all, the jury was twice admonished to disregard the testimony relating the statement. More impor-

tantly, however, we fail to see how the statement the jury heard was in fact in any way harmful to the appellant. The actual statement the jury heard—"Something is going to happen. I got to go home."—seems quite innocuous and probative of very little, if anything, concerning the appellant. In view of this and the court's instructions to disregard the testimony, we do not think that the admission of the victim's statement constituted error so prejudicial as to require reversal.

Appellant further argues that the court should have declared a mistrial based on the prosecutor's misconduct in asking Mrs. Tapia what was said in spite of the judge's admonitions to allow the court to rule on the admissibility of the statement before eliciting testimony regarding it. The granting of a mistrial is a matter within the trial court's discretion. While we certainly do not condone the prosecutor's conduct, we do not think that the court abused its discretion in not granting a mistrial in view of the foregoing discussion concerning the insubstantial effect the statement had on the jury. As we said in State v. Moore, 108 Ariz. 215, 222, 495 P.2d 445, 452 (1972), "Misconduct alone will not cause a reversal, as a new trial should not be granted to punish counsel . . . ." The court's refusal to grant a mistrial was therefore not erroneous.

## V. KNOWING AND INTELLIGENT WAIVER

The fifth contention on appeal deals with whether the appellant knowingly and intelligently waived his constitutional Miranda [2] rights prior to giving certain incriminating statements to the police. He argues that because he had been drinking at the time of his arrest and because of his limited intelligence and little education, he could not have knowingly waived his rights. We disagree.

Before a statement of a defendant is admissible, there must have been a know-

2. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

ing and intelligent waiver by the defendant of his constitutional rights. *State v. Humphrey*, 23 Ariz.App. 204, 531 P.2d 1142 (1975). At trial, a voluntariness hearing was held outside the presence of the jury. The trial judge, after taking testimony, concluded that the appellant's statements were given voluntarily and that he knowingly and intelligently waived his rights.

The facts disclose that the appellant was apprehended at a bar. While he may have been drinking, there was no evidence presented to show that he was intoxicated. In fact, the only testimony given concerning the appellant's intoxication was to the effect that he did not exhibit any of the usual outward signs of intoxication. Obviously the evidence could not support a finding that the appellant was inebriated to the degree that he was unable to understand the substance of the rights he was waiving or the import of his statements.

■ Concerning the appellant's intellectual level, we have previously stated that low intelligence, in itself, does not necessarily vitiate an otherwise knowing and voluntary waiver. *State v. Drury*, 110 Ariz. 447, 520 P.2d 495 (1974).

■ If the lower court's determinations are supported by substantial evidence, they will not be disturbed on appeal. *State v. Mumbaugh*, 107 Ariz. 589, 491 P.2d 443 (1971). Considering the totality of the circumstances, *State v. Drury, supra*, the record abundantly supports the trial court's findings. Officer Dill testified that he read the appellant his rights although he did not believe that he had asked if appellant understood them. Officer Middleton, however, had previously read the appellant his rights and he testified that he had asked appellant if he understood them, to which the appellant replied he did. The appellant himself took the stand, though strictly for purposes of the voluntariness hearing, and acknowledged that the officers had indeed read him his rights. Considering this testimony and the record as a whole, we are convinced that the trial court's findings were amply supported and we therefore find there to be no error.

## VI.  APPELLANT'S THREATS TO KILL ANOTHER

■ During the state's case-in-chief, Larry Lenderman, the appellant's former employer, testified, over the objection of defense counsel, that the appellant had told him four and one-half hours before the murder "that some man was fooling around with his wife and that if he found out who it was, he would kill him." It is argued that the appellant's statement was hearsay and should not have been admitted. The question of the admissibility of this testimony was argued extensively by counsel below at both the omnibus hearing held before trial and then again during trial outside the hearing of the jury. After careful consideration, the trial court ruled that the appellant's statements to Mr. Lenderman were admissible to show the defendant's state of mind at or near the time of the murder. We agree with the ruling of the trial court.

Whether the statement of the appellant was hearsay is not the controlling issue here. Indeed, because the statement was offered not to prove the truth of the matters asserted therein but rather to establish the appellant's state of mind, it was not excludable as hearsay. *State v. Michael*, 107 Ariz. 126, 483 P.2d 541 (1971); *State v. Ceja*, 113 Ariz. 39, 546 P.2d 6 (1976); Udall, *Arizona Law of Evidence*, § 173(4) at 353. Rather, what is at issue is whether the threat of the appellant towards an unnamed and possibly nonexistent third party is *relevant* to demonstrate the appellant's state of mind toward the eventual victim, his wife. The state offered the statement to show intent, premeditation and deliberation. Clearly, these issues were material.

■ The test to be applied here is whether there was a reasonable and sufficient connection between the threat to the third person and the killing. *People v. Merkouris*, 46 Cal.2d 540, 297 P.2d 999 (1956); *Opie v. State*, 389 P.2d 684 (Wyo.1964). *Cf. State v. Crow*, 104 Ariz. 579, 457 P.2d 256 (1969). As enunciated by the California Supreme Court:

" 'While threats against the deceased are admissible in evidence to show malice, threats against another person are only admitted under circumstances *which show some connection with the injury inflicted on the deceased.'* . . . Where a sufficient connection is shown such threats are clearly admissible." *People v. Merkouris, supra,* 46 Cal.2d at 557, 297 P.2d at 1010.

The connection here is obvious. The appellant's threat, while stated to be directed only at the supposed "other man" was certainly evidence of his anger with both the third person and his wife. He was enraged not singularly with the unnamed man "fooling around" with his wife but was undoubtedly incensed with the illicit relationship in general to which his wife was, at least in his mind, an intimate participant. To say that the threat to his wife's lover has no relation to the murder of his wife would require us to view the appellant's statement in complete vacuum and this we refuse to do. Clearly, the threat was probative of and would tend to establish his mental state concerning his wife several hours before the murder and was therefore admissible.

## VII. EXPERT TESTIMONY OF DR. TUCHLER

Under the appellant's seventh argument, essentially three separate issues are raised, all of which deal with the expert testimony of Dr. Tuchler. The first of these issues concerns the state's noncompliance with the rules of discovery in allegedly failing to inform the defense of Dr. Tuchler's conclusions concerning whether the appellant knew right from wrong on the day of the murder.

At the Rule 11 competency hearing (Rule 11, Rules of Criminal Procedure, 17 A.R.S.), Dr. Tuchler was unable to testify on whether the appellant knew right from wrong, stating that he did not have sufficient information upon which to base an opinion. He did state, however, that were he supplied the information as to how the subject acted that day, what statements he may have made, and in general, the facts surrounding the killing, he would probably be able to come to a conclusion on the appellant's mental state at the time in question. Prior to concluding that hearing, the prosecutor stated that he would in fact supply the doctors with that pertinent information for their further consideration. By the time of trial, Dr. Tuchler, having been given additional information, apparently had formed an opinion based on certain statements of the appellant made the day of the murders. His opinion was that the appellant could on that day distinguish right from wrong. Upon cross-examination, Dr. Tuchler testified that he had, just several days before, formed this opinion. When asked whether he had informed the prosecutor, he said "Yes." Defense counsel thereupon approached the bench and objected to the doctor's testimony, charging the prosecution with noncompliance of the rules of discovery, rule 15.1 Rules of Criminal Procedure, 17 A.R.S., in failing to disclose to the defense the substance of the doctor's conclusions before trial.[3] A discussion was then held at the bench wherein the prosecutor denied prior knowledge of Tuchler's testimony and, further, asserted that he had just that day prior to the doctor's testimony been informed as to how the doctor would testify on that issue. The trial judge overruled the defense objection and Dr. Tuchler was allowed to continue in his testimony. Later, the defense moved to preclude or strike the testimony of Dr. Tuchler based on the same grounds. The prosecutor again maintained that he first learned of the doctor's anticipated testimony right before the

3. Rule 15.1, in material part, reads as follows: "(a) . . . the prosecutor shall make available to the defendant for examination and reproduction the following material and information within his possession or control:

. . . . .

"(3) The names and addresses of experts who have personally examined a defendant or any evidence in the particular case, together with the results of physical examinations and of scientific tests, experiments or comparisons, including all written reports or statements made by them in connection with the particular case."

commencement of the afternoon session. After argument was had on the issue, the court allowed the testimony to stand. On appeal, the appellant contends that the court abused its discretion in so ruling.

■ Rule 15.1 of the Rules of Criminal Procedure, 17 A.R.S., requires that the prosecution disclose the names and addresses of the experts who have examined a defendant and the results of the examinations performed. Rule 15.6 imposes on all parties a continuing duty to disclose. Rule 15.7 suggests various sanctions that the trial court may impose for noncompliance with any of the discovery provisions. The imposition of sanctions for nondisclosure is wholly a matter within the discretion of the trial court. *State v. Clark*, 112 Ariz. 493, 543 P.2d 1122 (1975).

■ Upon a review of the record, we are of the opinion that the court did not abuse its discretion. First, we note that the record is, at best, indeterminate as to whether there was in fact noncompliance with the rules of discovery. While Dr. Tuchler did reply in the affirmative when asked whether he had informed the prosecutor of his conclusions, he never stated *when* he so informed him, was not questioned further on the matter and was never allowed to elaborate. The prosecutor, on the other hand, twice denied such prior knowledge and further claimed that he was first made cognizant of the doctor's opinion on that very day. Apparently, the trial court believed the prosecutor and accordingly refused to impose any sanctions.

■ However, even presuming for purposes of argument that there was an inadvertent noncompliance, the appellant's contentions still must fall in view of his failure to demonstrate how he suffered prejudice as the result of the prosecutor's nondisclosure. Absent a showing of prejudice to the appellant, this court will not find a trial court's refusal to impose sanctions to amount to an abuse of discretion. *State v. Clark, supra.* The appellant maintains that because defense counsel was surprised that the state would offer expert testimony on

the sanity issue, he was unprepared to cross-examine the witness. We disagree both with the fact that defense counsel was surprised and with the fact that he was unprepared to cross-examine the doctor. Defense counsel was first put on notice that the doctor would most likely be able to testify on the sanity issue as early as the competency hearing. It will be recalled that Dr. Tuchler there testified that if he were given additional pertinent information, such as the appellant's statements and conduct on the day of the murder, he could probably form an opinion concerning the appellant's state of mind. The prosecuting attorney specifically stated on the record at that hearing that he would, in fact, supply the doctors with the additional reports and statements of appellant for further consideration. Indeed, the defense knew or should have known that the doctor had been supplied with the information by the time of trial and the defense further was aware that the doctor would be called by the state in rebuttal. We do not think the defense was or should have been surprised. Moreover, defense counsel did not request a continuance to prepare his cross-examination, and with good reason, as the doctor's testimony was not of the nature that it would be easily, if at all, rebuttable or impeachable. Finally, we note that counsel conducted a quite laudable and complete cross-examination of the doctor, in spite of his alleged surprise. Upon our review of the record, we can find no prejudice having resulted from the alleged nondisclosure of the doctor's conclusion and we therefore hold that there was no abuse of discretion.

■ The appellant next argues that reversible error was committed when Dr. Tuchler was allowed to testify to the facts surrounding the crime as related to him by the appellant. In support of this contention, the appellant relies principally on Rule 11.7(b)(1), Rules of Criminal Procedure, 17 A.R.S., and *State v. Evans*, 104 Ariz. 434, 454 P.2d 976 (1969). The rule reads:

"No statement of the defendant obtained under these provisions, or evidence resulting therefrom, concerning the events

which form the basis of the charges against him shall be admissible at the trial of guilt or innocence, or at any subsequent proceeding to determine guilt or innocence, without his consent."

In *State v. Evans, supra*, we held that it was fundamentally unfair to a defendant to permit a psychiatrist to divulge to the jury the defendant's incriminating statements obtained at the doctor's examination. Our holding was premised on the physician-patient privilege, its underlying policy considerations and due process requirements of fairness. We said:

"The obvious policy underlying the physician-patient privilege is that patients should be encouraged to make full and frank disclosures to those who are attending them. While we do not believe that allowing Dr. Baker to testify about his conclusions concerning defendant's sanity derogates from this policy, we do think that to permit even a psychiatrist acting for the court to transmit a defendant's incriminating statements to a jury is fundamentally unfair." 104 Ariz. at 436, 454 P.2d at 978.

We reaffirmed the holding of *Evans* in *State v. Magby*, 113 Ariz. 345, 554 P.2d 1272 (1976), relying on Rule 11.7(b)(1) and A.R.S. § 13–1621 (the latter of which was replaced by the former effective September 1, 1973). In *Magby*, this court found that error had been committed in permitting the court-appointed psychiatrist to testify, absent the consent of the defendant, to the circumstances surrounding the shooting as related to him by the defendant during the Rule 11 examination. We held, however, that while the admission of this testimony was erroneous, it was merely cumulative evidence of the accused's guilt which was otherwise overwhelmingly established and therefore we deemed the error to be harmless beyond a reasonable doubt.

In the case *sub judice*, Dr. Tuchler, upon being asked what information he obtained from the appellant concerning the crime, testified as follows:

"He reported that he and Teresa had been fighting. He had just returned from Texas where he visited his older brother. 'Teresa fought with me', he stated. There is some involvement over another daughter who had some tragic difficulty in a quarrel with the mother. He remembers, he states that they were quarreling. The rest, he states, 'I don't remember'. Quote, 'The next day they told me. I had come to Phoenix and', he stated, 'I was not used to drink. I got drunk.'

"And those are the statements concerning the act which he reported."

And then later when asked what conclusion he had arrived at concerning whether the appellant knew right from wrong, he testified, albeit unresponsively:

"One, he reported that he was quarreling, that he was angry.

"Two, he reported that he had a gun, that he fetched the gun. He doesn't recall whether it was in the car or in the house.

"Three, he does not know the amount of alcohol that he drank. . . ."

Following this enumeration of the factors upon which he based his conclusion, the doctor opined that the appellant did know right from wrong.

There can be no question but that the appellant's statements as related by Dr. Tuchler, concerned "the events which form the basis of the charges against him." Rule 11.7(b)(1). There remains, however, the question of whether this testimony was merely cumulative and therefore harmless, or whether its erroneous admission mandates reversal.

There is ample evidence in the record to indicate that the appellant and his wife had been quarreling, both on the day in question and previous thereto, that the appellant had just returned from a two-week visit to Texas, and that he had not drunk for five or six years. There was further testimony by Johnny Pena, who had been with the appellant on the day of the murders, that the appellant was quite drunk and that the appellant had gone into his home with the gun he had brought back from Texas. Of course, there was psychiatric evidence

presented by the defense that the appellant could not remember any of the events surrounding the murder itself. In light of this evidence, all of which was presented prior to the testimony of Dr. Tuchler, it is apparent the doctor's testimony, while improperly admitted, was merely cumulative. Considering this and the fact that the appellant neither rebutted nor attempted to rebut any of this evidence but rather chose to rely wholly on his alcoholic amnesia defense, we hold that the admission of this testimony was harmless beyond a reasonable doubt. *State v. Magby, supra.*

The appellant also contends under this his seventh argument on appeal that the submission to the prosecuting attorney of Dr. Tuchler's report containing statements of the appellant concerning the crime was reversible error relying on *State v. DeCello,* 113 Ariz. 255, 550 P.2d 633 (1976) and rule 11.4(a), Rules of Criminal Procedure, 17 A.R.S. Rule 11.4(a) reads:

". . . The reports of experts made pursuant to Rule 11.3 shall be made available to all parties, except that any statement or summary of the defendant's statements concerning the offense charged shall be made available *only to the defendant.*" (emphasis added).

In *State v. DeCello, supra,* this court held that "[i]t was error for defendant's statements concerning the crime to be made available to the county attorney, even though the information was not introduced at the trial." 113 Ariz. at 257, 550 P.2d at 635.

Here, the state apparently concedes that the psychiatrist's reports were made available to the prosecutor and that there were certain statements of the appellant's in Dr. Tuchler's report which should have been excised. According to *State v. DeCello, supra,* this unquestionably constitutes error. Nevertheless, we do not think this error mandates reversal in view of our foregoing discussion of the cumulative nature of the statements when testified to by Dr. Tuchler at trial. The defense having failed to demonstrate prejudice, the claim must fail.

## VIII. PROSECUTOR's CLOSING ARGUMENT

It is next maintained that the prosecutor's comments made during closing argument were improper and so prejudicial as to require reversal. In addressing his contentions, we are referred to the oft-cited case of *Sullivan v. State,* 47 Ariz. 224, 55 P.2d 312 (1936), wherein this court set forth the test we need here apply:

"The best rule for determining whether remarks made by counsel in criminal cases are so objectionable as to cause a reversal of the case is, Do the remarks call to the attention of the jurors matters which they would not be justified in considering in determining their verdict, and were they, under the circumstances of the particular case, probably influenced by these remarks." 47 Ariz. at 238, 55 P.2d at 317.

We have reviewed the state's closing arguments and have concluded that while certain of his comments were perhaps indiscreet, they were not of such a nature under the above-delineated test as to require reversal.

## IX. VOLUNTARY MANSLAUGHTER INSTRUCTION

The appellant on several occasions requested that the court give an instruction on voluntary manslaughter based on the evidence that the appellant was intoxicated, had been quarreling with his wife and was provoked by her supposed illicit affair. Extended argument on this question was heard by the judge in chambers after which he denied the appellant's request. Appellant now complains that the court's ruling was erroneous.

Of course, it is the duty of the trial court to instruct on all grades of homicide which are reasonably supported by the evidence and to refuse to instruct if not so supported. *State v. Dixon,* 107 Ariz. 415, 489 P.2d 225 (1971). Voluntary manslaughter is defined as a killing occurring upon a sudden quarrel or heat of passion. § 13–456 A.R.S. In order to justify a charge of

voluntary manslaughter, the heat of passion must have been aroused by adequate provocation. *State v. Munoz*, 110 Ariz. 419, 520 P.2d 291 (1974). Without doubt, the information provided to the appellant that his wife was engaged in adulterous conduct constituted, irrespective of its truth, adequate provocation. *See* LaFave and Scott, *Criminal Law*, § 76, pp. 575–77. A second prerequisite to justify a voluntary manslaughter charge is that the "hot blood" engendered in the particular defendant shall not have cooled *and* there must not have been an elapse of time, a so-called "cooling period," between the provocation and the killing within which the "hot blood" of a reasonable man would have cooled and his fury subsided. LaFave and Scott, *Criminal Law*, § 76, pp. 579–81; *see also Bartram v. State*, 33 Md.App. 115, 364 A.2d 1119 (1976); *People v. Cooley*, 211 Cal. App.2d 173, 27 Cal.Rptr. 543 (1962).

Viewing the facts in this case and considering the appellant's conduct from the provocation to the murder, we are of the opinion that reasonable men could not have differed in the conclusion that the appellant's blood had indeed cooled by the time he killed his wife. While we cannot ascertain from the record at what point the appellant first learned of his wife's supposed affair, it is certain that he knew about it prior to 4:00 P.M. It was at that time that he went to Jordan's Used Car Lot where he worked and talked with his boss, Larry Lenderman. Lenderman testified that the appellant was somewhat hostile, though not towards him, and was then in possession of the eventual murder weapon, the .38 Special. He further testified as mentioned earlier, that the appellant stated that another man was fooling around with his wife and if he caught him he would kill him. The appellant reportedly conversed with Lenderman for anywhere from 15 to 45 minutes. From there he drove to a field where his friend, Johnny Pena, was working. He waited in the field for Pena to get off work at 6:00 P.M., at which time the two proceeded, at the appellant's request, to Pena's mobile home to retrieve a box of bullets that the appellant had left there some time

before. They then went "hunting" which consisted of Pena shooting five shots at a dove. After reloading the gun, Pena and the appellant drove to the appellant's home in order that Pena might borrow the appellant's razor to shave. The house was empty and the appellant could not find his razor so they left. They returned at approximately 8:30 P.M., at which time the killing occurred. It does not seem that these facts could be construed to evince an uncontrollable and unabated fury in the appellant, commencing when he learned of the affair and culminating in the killing of his wife. On the contrary, the appellant's movements from 4:00 P.M. to 8:30 P.M. indicate a cool and deliberate state of mind. We hold that as a matter of law, the killing did not occur in the heat of passion. An instruction on voluntary manslaughter was therefore not supported by the evidence and the court's refusal to so instruct was correct.

## X. SENTENCING

It is the appellant's final argument that the court erred in failing to take into consideration the six months the appellant spent incarcerated prior to sentencing. Rule 26.10(b)(2) of the Rules of Criminal Procedure, 17 A.R.S., requires that, in pronouncing sentence the court shall "state that it has considered the time the defendant has spent in custody on the present charge." This was not done here presumably because the sentence imposed was a mandatory life sentence. However, because under A.R.S. § 13–453 the appellant will potentially be eligible for parole in twenty-five years, the presentence incarceration time becomes significant and should have been considered. As a result, pursuant to the powers vested in this court by A.R.S. § 13–1717, we modify the sentence imposed to take into account the six-month period previously served by the appellant.

The judgment of conviction is affirmed. The sentence is affirmed as modified.

CAMERON, C. J., STRUCKMEYER, V. C. J., and HOLOHAN and GORDON, JJ., concur.