**STATE of South Dakota, Plaintiff and Appellee,**

v.

**David Ray BRADLEY, Defendant and Appellant.**

No. 15813.

Supreme Court of South Dakota.

Argued Aug. 29, 1988.

Decided Nov. 9, 1988.

Robert Mayer, Asst. Atty. Gen., Pierre, for plaintiff and appellee; Roger A. Tellinghuisen, Atty. Gen., Pierre, on the brief.

Richard Braithwaite of Braithwaite Law Offices, Sioux Falls, for defendant and appellant.

HENDERSON, Justice.

### PROCEDURAL HISTORY/ISSUES

Defendant David Ray Bradley was charged with first-degree murder under SDCL 22–16–4, and was found guilty by a Minnehaha County jury. Thereafter, he was sentenced to life imprisonment in the State Penitentiary. Bradley appeals his conviction alleging trial court error in four regards:

(1) The trial court erroneously ruled as a matter of law that a State witness was not an accomplice;

(2) Evidence concerning prior bad acts was inadmissible;

(3) Hearsay testimony that the victim was afraid of the defendant was improperly admitted; and

(4) The trial court's refusal to admit testimony concerning a traffic count at the site where the victim was found was an abuse of discretion.

We hold the trial court was correct on Issues (1) and (2), correct for the wrong reason on Issue (3), and that its decision on Issue (4) was not an abuse of discretion. Finding no error, we affirm the conviction in this sordid, and gruesome, case of murder.

### FACTS

On September 4, 1986, at approximately 6:00 p.m., two men gathering mushrooms in a roadside ditch near Renner, South Dakota, discovered a badly decomposed hu-

man corpse. The head of the body had been severed and lay a few feet away. An identification card found in a pocket of a pair of discarded jeans, which lay nearby, indicated that the body might be that of a twenty-two-year-old Indian woman named Jamie Thunder Hawk. Dental records confirmed this fact. Thunder Hawk's body was too badly decomposed for the coroner to determine a cause of death, but his autopsy report indicated that the decapitation, which apparently was carried out by sawing with a large knife, had been inflicted post-mortem. Nor could the coroner establish an exact time of death: He estimated that Thunder Hawk had probably been killed two or three weeks before her body was found.

Once Thunder Hawk had been identified, police interviewed many of her acquaintances in Sioux Falls, where she had lived. This led to the arrest of Bradley, who was Thunder Hawk's boyfriend, and two men, Vernon Lillegaard and Darryl Davids, with whom Bradley had shared an apartment during early August 1986.

On September 5, 1986, Davids, while being booked on a charge of being an accessory to Thunder Hawk's murder, asked to talk to a deputy, and subsequently told police that he had witnessed the murder, and that he, Lillegaard, and Bradley had driven to the place where Thunder Hawk was found. Bradley had cut off Thunder Hawk's head, hit her head with a tire iron, and dumped her body in the ditch, he said. According to his story, the actual murder took place the previous night, after Bradley and Thunder Hawk had quarreled over an incident involving a pair of shoes, which Bradley had allegedly taken, by force, from Thunder Hawk. In reference to robbery charges against Bradley stemming from that incident, Davids told police that Bradley said to Thunder Hawk: "If you think I'm going to go to prison for ten to fifteen years over a seven dollar pair of shoes, you're crazier than heck." Lillegaard, after initially denying any knowledge of Thunder Hawk's murder and the later decapitation, told a similar story to police.

Davids, at trial, testified that he had never seen the murder or the body, and that he told police only what they wanted to hear. Lillegaard, however, testified fully, stating that Bradley, angered over the robbery incident, had apparently pushed Thunder Hawk so that she had fallen backwards and been knocked unconscious against a stair step. There was evidence that Bradley stood over Thunder Hawk and kicked her in the ribs with his cowboy boots. Lillegaard, by his own words, held a door open while Bradley carried Thunder Hawk inside the apartment. Bradley then undressed Thunder Hawk and commenced having sexual intercourse with her. Thunder Hawk then revived and struggled, screaming "Get off me, you son-of-a-bitch." Bradley stated, "I ought to punch your head off." Thereupon, Bradley strangled her to death while Lillegaard passively watched. Davids, according to Lillegaard, had been outside, and did not become involved until Thunder Hawk was already dead. Bradley carried the corpse to Davids' car, and placed it in the trunk. The body was decapitated and disposed of, by Bradley, during a trip the three took to Baltic, South Dakota, on August 16, 1986.

We now discourse on testimony of several witnesses. Detailing Bradley's pre-homicide violence upon Thunder Hawk is vital to our consideration. Numerous witnesses testified that Bradley's relationship with Thunder Hawk was a violent one. Mary Ramey, in May 1986, had seen a cigarette burn on Thunder Hawk's neck, which Thunder Hawk said was inflicted by "David." In July, Thunder Hawk had a black eye. When Ramey asked why Thunder Hawk stayed with Bradley, she replied that Bradley would just find her again anyway. Judy Ebright, who was Thunder Hawk's roommate in May, June, and most of July 1986, testified that she saw Thunder Hawk in May with her hair partly cut off. Thunder Hawk told Ebright, in response to her questions, that Bradley had done it with a butcher knife, cutting her hands in the process (Ebright saw the scars). Ebright lent Thunder Hawk a pair of jeans on May 20, 1986. A few days later, Ebright noticed blood on them and

asked about it. Thunder Hawk replied that the blood was from an infected cigarette burn inflicted by Bradley. During the Fourth of July weekend, Ebright noticed bruises on Thunder Hawk's legs and, in the presence of Bradley, asked about the bruises. Thunder Hawk said that Bradley did it. Bradley did not react to Thunder Hawk's statement. On July 13, 1986, Thunder Hawk seemed normal to Ebright. The next day, however, Thunder Hawk exhibited a black eye, a cigarette burn, and bruises on her arms; all of this was inflicted, according to Thunder Hawk, by Bradley, after he caught her with Vernon Lillegaard. Later that month, Ebright noticed a scab on Thunder Hawk's leg where she had an "Elvis" tattoo, in honor of her husband (who was then in jail). Thunder Hawk, when asked, indicated that Bradley had tried to burn off the tattoo with a cigarette. Bradley, who was present during this conversation, just smiled. On July 22, 1986, Thunder Hawk, in a white uniform, crawled into Ebright's home, crying. She told Ebright that Bradley had "drug her around" and taken her shoes (Thunder Hawk had recently been hired as a nurse's assistant and was required to wear white clothing and shoes). The missing shoes were anonymously returned three or four days later, according to Ebright. In late July, Thunder Hawk moved out of Ebright's apartment, and Ebright did not see her again.

Barbara Gottsch, a bartender at the Frontier Bar, noticed Thunder Hawk's rough haircut in May 1986, and inquired about it. Thunder Hawk, Gottsch testified, told her that Bradley had cut it off with a knife. In June or July 1986, Gottsch watched while somebody bought Thunder Hawk a drink. She heard Bradley tell Thunder Hawk that "if he caught her messing around, the next time it would be her head that came off instead of her hair." Gottsch also saw Bradley burn Thunder Hawk with a lit cigarette on three separate occasions in the bar that summer; once, while he was kissing Thunder Hawk, he stubbed out his cigarette on her shoulder. Bradley, at least a dozen times, yanked Thunder Hawk's head around by the hair in

Gottsch's presence. He "took her hair one time and told her to look at him when he was talking to her and to tell me that he had never done anything mean while he was doing it." Gottsch related that Thunder Hawk, who frequented the Frontier Bar on an almost daily basis, was last there in late July or early August. Thunder Hawk had spoken on the phone to Bradley, and was going to meet him. Gottsch told her not to go, as Bradley had beaten her the night before. Thunder Hawk ignored Gottsch's advice, and Gottsch did not see her again.

Debra Harried, a part-time employee at the Frontier Bar, also testified that Bradley burned Thunder Hawk with cigarettes, once while kissing her, and saw him beat her with a telephone receiver three or four times. In May 1986, like Gottsch, Harried asked Thunder Hawk about her shorn hair, to which Thunder Hawk responded "that Dave had thrown her on the floor and had cut her hair off and told her that her throat would be next." Harried also saw Thunder Hawk, who was visibly upset, on the night Bradley allegedly took her shoes, and confirmed that Thunder Hawk was in her white uniform and had to borrow shoes so that she could go to work.

Another witness, Ramona Vassar, related that she had seen Bradley knock Thunder Hawk to the floor and kick her in February 1986, at the home of a friend. Vassar also saw Thunder Hawk's haircut in May, and was told by her that Bradley had done it with a butcher knife.

Victoria Grimm, an acquaintance of Bradley's, told of an incident on April 15, 1986, when Thunder Hawk broke a window at Grimm's residence, apparently in anger at finding Bradley there in the bedroom. Bradley chased Thunder Hawk, caught her outside the house, and beat her. Thunder Hawk later came to the door, and Bradley dragged her inside Grimm's house, where he beat her again. During both beatings, Bradley told Thunder Hawk he would kill her if she kept "messing with him," or kept "this shit up." Bradley grabbed Thunder Hawk by the throat when he threatened her the second time. (This would indicate

Bradley's previous violence upon Thunder Hawk's throat.) As narrated above, Bradley slit her throat, after she was dead, and completely severed her head from her body. After Thunder Hawk left that night, Bradley told Grimm that "if she kept it up he was going to kill her (Thunder Hawk)."

Lori Hinks, a bartender at the Arrow Bar, saw Thunder Hawk crying on July 22, 1986, and lent her a pair of white shoes. A week later, Hinks overheard Bradley asking Thunder Hawk to drop the charges stemming from the "shoe" incident, but Thunder Hawk declined. Hinks testified that she last saw Thunder Hawk on August 15, 1986, the day Lillegaard said that she was killed.

Several other witnesses related that Thunder Hawk feared Bradley (Elmer Paplow, Mary Ramey, Judy Ebright), and saw Bradley slap Thunder Hawk (Paplow), or grab her hair and punch her in the face (Lynn Williams), and Allee Guthmiller, Lillegaard's girl friend, related that Bradley once remarked that he did not think Thunder Hawk had long to live. Two witnesses also identified Davids' car as one they saw abandoned, in late August 1986, near the road where Thunder Hawk was found.

Police officers testified about their involvement in the case arising from the alleged theft of Thunder Hawk's shoes, and Bradley's arrest for that act. A man named Robert Smith told of accompanying Bradley when he recovered Thunder Hawk's missing shoes from under a concrete object in an alley. Barbara Coy, another girl friend of Bradley's, and half-sister of Robert Smith, stated that Bradley had often told her that if Thunder Hawk testified against him regarding the shoe incident, he would "pinch her head off." Although Bradley often talked of Thunder Hawk and the robbery charges before August 15, 1986, according to Coy, he was silent about both after that date, never raising either subject. When Coy mentioned that she had not seen Thunder Hawk either at home or around town, Bradley stated that "Jamie wouldn't be bothering us anymore."

After August 15, 1986, Bradley changed his behavior by reducing his drinking and staying home, whereas he had previously gone downtown regularly despite Coy's entreaties. After the police began investigating Thunder Hawk's death, Coy turned a pair of Bradley's boots over to them, after which Bradley became upset and told her to stop talking to them. Out of nowhere, Bradley began saying to Coy that the boots had gotten wet, and repeated it several times (the boots had a line similar to immersion marks, and Thunder Hawk's body was found partly immersed in water in the roadside ditch).

The defense put alibi witnesses on the stand to establish that Bradley (he supposedly was staying with yet another girl friend) and Davids were elsewhere at crucial times on August 11 and 12, 1986. Defense counsel vigorously attacked Lillegaard's credibility, noting inconsistencies in various accounts he gave police, his long history of mental problems, and several instances when Lillegaard wrote or said that he had lied. The jury, notwithstanding, found Bradley guilty of premeditated murder whereupon this appeal followed.

## DECISION

### I. *Accomplice Instructions*

■ Bradley first contests the trial court's rejection of his proposed jury instructions concerning accomplices and accomplice testimony. The first such instruction provided:

> You are instructed that the testimony of an accomplice ought to be viewed with distrust. This does not mean that you may arbitrarily disregard such testimony, but you should give to it the weight to which you find it to be entitled after examining [it] with great care and caution and in the light of all the evidence of the case.

Bradley's second rejected instruction directed that Vernon Lillegaard was an accomplice as a matter of law, and that conviction could not be had unless corroborating evidence independent of the accomplice's testimony linked the defendant to the crime. Bradley also proposed a third

instruction, which defined "accomplice," discussed the corroboration requirement, and left it to the jury to decide whether any witnesses in the case were accomplices.

The instructions Bradley proposed correctly reflected the law regarding accomplices, but the question is whether they had any application given the evidence in this case. The trial court decided that there was insufficient evidence for the jury to find Lillegaard to be an accomplice. We agree.

Bradley argues that the jury was not bound to accept Lillegaard's uncontradicted testimony that Thunder Hawk was actually dead when Lillegaard began assisting Bradley (by acting as a lookout when the body was placed in the car's trunk). Bradley asserts that Thunder Hawk could have been alive at that point, and died later in the trunk. If the jury were to believe that Thunder Hawk was actually still alive when Lillegaard began acting as lookout, Bradley asserts that Lillegaard would have been an accomplice, and rejection of his proposed instructions therefore constituted reversible error. However, this scenario is not supported by any evidence. On this record, Lillegaard was, at most, an accessory after the fact:

> If a person after the commission of a felony, conceals or aids the offender with knowledge that he has committed a felony and with intent that he may avoid or escape from arrest, trial, conviction, or punishment, he is an accessory, SDC 13.-0203, but not an accomplice. [We note

that SDC 13.0203 exists under our current statutes, SDCL §§ 22–3–3[1] and 22–3–5.[2]] (Footnotes added.)

*Woods v. Solem,* 405 N.W.2d 59, 64 (S.D. 1987) (quoting *State v. Johnson,* 81 S.D. 600, 606–07, 139 N.W.2d 232, 236 (1965)). "An accomplice is one who is liable to prosecution for the identical offense charged against the defendant on trial." *Woods,* 405 N.W.2d at 63 (quoting *State v. Jackson,* 371 N.W.2d 341, 344 (S.D.1985), and *Johnson,* 81 S.D. at 606, 139 N.W.2d at 236). *See also State v. Lingwall,* 398 N.W. 2d 745, 747 (S.D.1986); *State v. Dominiack,* 334 N.W.2d 51, 53 (S.D.1983). "To render one an accomplice, he must in some manner knowingly and with criminal intent participate, associate, or concur with another in the commission of a crime." *Lingwall,* 398 N.W.2d at 747; *State v. Runge,* 89 S.D. 376, 384, 233 N.W.2d 321, 326 (1975); *Johnson,* 81 S.D. at 606, 139 N.W.2d at 236.

As in *Woods,* the evidence does not indicate that Lillegaard "knowingly, voluntarily, and with a common intent—with the principal offender—united in the commission of the crime of premeditated murder." *Woods,* 405 N.W.2d at 63. No evidence suggests that he promoted, facilitated, planned or participated in premeditated murder. Nor is there evidence that he aided, abetted, or advised Bradley in committing premeditated murder. Had the evidence supported an inference that Lillegaard was an aider and abettor, he could have been prosecuted for premeditated

---

**1.** SDCL 22–3–3 provides:

Any person who, with the intent to promote or facilitate the commission of a crime, aids, abets or advises another person in planning or committing the crime, is legally accountable, as a principal to the crime.

**2.** SDCL 22–3–5 provides:

A person is an accessory to a crime, if, with intent to hinder, delay or prevent the discovery, detection, apprehension, prosecution, conviction or punishment of another for the commission of a felony, he renders assistance to the other person. There are no accessories to misdemeanors.

"Render assistance" means to:

(1) Harbor or conceal the other person;

(2) Warn the other person of impending discovery or apprehension, except that this does

not apply to a warning given in an effort to bring the other person into compliance with the law;

(3) Provide the other person with money, transportation, a weapon, a disguise or any other thing to be used in avoiding discovery or apprehension;

(4) Obstruct anyone by force, intimidation or deception in the performance of any act which might aid in the discovery, detection, apprehension, prosecution, conviction or punishment of the other person; or

(5) Conceal, destroy or alter any physical evidence that might aid in the discovery, detection, apprehension, prosecution, conviction or punishment of the other person.

A violation of this section is a Class 5 felony.

murder, and Bradley's argument would have merit. *See, e.g., State v. Miller,* 429 N.W.2d 26, 41 (S.D.1988) (there is no distinction between an accessory before the fact and a principal, and aiders and abettors are liable as principals); *see also Graham v. State,* 346 N.W.2d 433, 434–35 (S.D. 1984) (advisor and instigator of robbery is an aider and abettor in first-degree manslaughter that resulted, and is accountable as a principal).

In contrast to Lillegaard, Bradley was linked to the murder by overwhelming circumstantial evidence, including his own threats against Thunder Hawk's life, his physical abuse of her, and his statement, after her death but before her body was found, to the effect that she would no longer be bothering him. Bradley was facing criminal charges (first-degree robbery, supported by Thunder Hawk's potential testimony). Repeatedly, Bradley had either asked or warned Thunder Hawk to back out of the robbery charges. No such scenario existed insofar as Lillegaard was concerned.

This Court has repeatedly held that "[w]hether one is an accomplice may be a question of law for the court or one of fact for the jury depending upon the state of the evidence." *State v. Lingwall,* 398 N.W.2d at 747; *State v. Hoadley,* 319 N.W. 2d 505, 507 (S.D.1982); *State v. Johnson,* 81 S.D. at 607, 139 N.W.2d at 236. At the time Thunder Hawk was strangled to death, the evidence reveals Lillegaard was there, in his own apartment, watching. He was a witness to murder. There is no affirmative evidence reflecting Thunder Hawk was alive when carried to the trunk of the car.

> [M]ore than mere presence at the time and place where the crime is committed is required in order to make one an accomplice, and it makes no difference that the one present remained silent or even acquiesced in the commission of the offense, if he is under no legal duty to act for the prevention of the crime.

*State v. Johnson,* 81 S.D. at 606, 139 N.W. 2d at 236. While presence at the scene may, with other facts and circumstances,

support a finding of guilt of the principal offense, *State v. Schafer,* 297 N.W.2d 473, 476 (S.D.1980), the evidence here does not support such a finding. We therefore affirm the trial court on this issue. As Lillegaard was not an accomplice, we do not reach Bradley's argument that there was insufficient independent evidence to corroborate Lillegaard's accomplice testimony.

### II. *Prior Bad Acts*

SDCL 19–12–5 provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

As indicated in the facts set out above, much testimony concerning Bradley's mistreatment of Thunder Hawk in the six months prior to her death was admitted into evidence over his objection. The trial court carefully instructed the jury, throughout the proceedings, to consider such evidence only in regards to motive, intent, or identity, and specifically allowed the bad act testimony because the witnesses had seen physical manifestations (black eye, bruises, burns, chopped hair) of abuse or saw the acts themselves. The trial court considered the evidence outside the presence of the jury and found sufficient indicia of reliability to admit it (one incident, which took place in 1985, the trial court found too remote). This was within the guidelines set out in *State v. Luna,* 378 N.W.2d 229 (S.D.1985). The trial court's consideration of the evidence in this case was also consistent with the recent unanimous case of *State v. Kerkhove,* 423 N.W.2d 160 (S.D. 1988), wherein this Court required these determinations: 1) That the proffered evidence is relevant; and 2) that the probative value of the evidence exceeds its prejudicial effect. *Kerkhove,* 423 N.W.2d at 162 (citing *State v. Thomas,* 381 N.W.2d 232 (S.D. 1986); *State v. Reutter,* 374 N.W.2d 617 (S.D.1985)). As the State argues, "there was no bell to unring." The prior bad acts

in *Kerkhove*, which involved a woman found dead of manual strangulation who also had bruises on her head and face, consisted of "assaults and other abuse," "steadily increasing in severity until Sharon was finally murdered...." *Kerkhove, id.* at 163. This Court observed, in affirming the *Kerkhove* trial court's admission of such prior acts:

> Kerkhove denied participating in Sharon's murder. Therefore, identity is in issue. Kerkhove's prior assaultive behavior is highly probative of his motive and identity as well as being a link in the chain of evidence relating to his modus operandi.
>
> The prejudicial effect of the evidence "does not mean damage to the opponent's case that results from the legitimate probative force of the evidence; rather, it refers to the unfair advantage that results from the capacity of the evidence to persuade by illegitimate means."

*Kerkhove*, 423 N.W.2d at 163 (quoting *State v. Holland*, 346 N.W.2d 302, 309 (S.D.1984)). Here, as in *Kerkhove*, the admission of prior acts was within the sound discretion of the trial court, as these acts were allowable under SDCL 19–12–5. However damaging they were to Bradley's case, they were not unfairly so. *State v. McDowell*, 391 N.W.2d 661 (S.D.1986) (allowed evidence of a defendant's plotting to kill his wife some eight years before the event). This evidence was admissible.

### III. *Hearsay Regarding Thunder Hawk's Fear of Bradley*

■ Bradley's third assignment of error concerns the trial court's admission of hearsay testimony of six witnesses to the effect that Thunder Hawk was afraid of him. Bradley admits that the hearsay evidence fit within the "state of mind" exception to the hearsay rule codified in SDCL 19–16–7 (Rule 803(3)), which provides, in pertinent part:

> A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition, such as intent, plan, motive, design, mental feeling, pain, and bodily health, is not excluded by § 19–16–4 [hearsay not admissible except as otherwise provided], even though the declarant is available as a witness....

The trial court found the statements regarding Thunder Hawk's fear of Bradley relevant as it related to both the prior bad acts on the part of Bradley, towards her, and to Thunder Hawk's behavior. Case authority weighs against Bradley, as *United States v. Brown*, 490 F.2d 758 (D.C.Cir. 1973), *State v. Christensen*, 129 Ariz. 32, 628 P.2d 580 (1981), *State v. Lehman*, 126 Ariz. 388, 616 P.2d 63 (1980), *State v. Ramirez*, 116 Ariz. 259, 569 P.2d 201 (1977), and *State v. Blanchard*, 315 N.W.2d 427 (Minn.1982), all make reference to relevance regarding accidental death or suicide, or other material issues as justifying admission of statements of fear. As no physical evidence of cause of death existed, an inference could be made that perhaps Thunder Hawk had not been killed. Bradley, before trial, made a motion for appointment of an expert witness, Dr. Michael Graham, M.D., to testify as to "natural causes of death or other causes of death which do not constitute homicide." Indeed, on cross-examination of the coroner, one of Bradley's tactics was to ask whether he could rule out alcohol or drug overdose as a cause of death (to which the coroner responded that he could not). In the circumstances of this case, this was an alternate source of relevance. The evidence was relevant to a material issue in this case.

The *Brown* decision, extensively quoted in the appellant's reply brief at pages 25–26, does not decry any admission of "fear" evidence; rather, it disapproved of such evidence where a court "entirely ignored the relevance balancing process which seeks to avoid undue and unnecessary prejudice and confusion." *Brown*, 490 F.2d at 773 (footnote omitted). If the trial court erred, according to *Brown*, in using identity as the issue to which the evidence was relevant, it was admissible regarding the nature of Thunder Hawk's death. Any error in hinging relevance to identity was nonprejudicial as the evidence was material

to issues other than identity. The nature of Thunder Hawk's death was put in issue by Bradley, distinguishing this case from *State v. Cameron*, 100 Wash.2d 520, 674 P.2d 650 (1983) (where self-defense was a non-issue raised solely by the State). Had the "fear" applied only to identity, reversal might be in order, per *Brown*, as the victim's state of mind has nothing to do with identity—it's really putting the cart before the horse.

IV. *Refusal to Admit Testimony Regarding a "Traffic Count" Carried out by Bradley's Investigator*

■ The final error alleged by Bradley was the trial court's refusal to allow into evidence testimony from Bradley's investigator concerning the frequency with which cars passed the location where Thunder Hawk's body was deposited. The "traffic count" in question was carried out in March 1987, a different season from August 1986, when Thunder Hawk's body was left by the wayside. The offer of proof by Bradley at trial reveals that the time span, between cars, was as long as seventeen minutes, whereas Lillegaard, whose testimony the traffic count was supposed to weaken, indicated that the time taken to decapitate Thunder Hawk and dispose of her remains took as little as seven minutes. The coroner estimated that the decapitation itself could take five to ten minutes, or much less, even for the average person, depending on that person's level of motivation. The traffic count, as the trial court indicated in the record, had "very little probative value" and would confuse and mislead the jury. The weakness of this evidence is reflected by Bradley's argument that the results were actually less favorable to him than a count in August would be, as traffic was heavier then.

*State v. Jenkins*, 260 N.W.2d 509 (S.D. 1977), sets out a three-part test for experimental evidence: (1) Is the evidence relevant; (2) does it have probative value; and (3) is the recreation of conditions so dissimilar to the original event that, even after effective highlighting of the dissimilarities, the demonstration would be misleading to the jury? *Jenkins, id.* at 511. "The test

facing the trial judge is one of weighing the probative value of the experiment evidence against the dangers of misleading the jury." *Jenkins, id.* (citing *McCormick on Evidence* § 202 (2d ed. 1972)). Here, the trial court found a lack of foundation relating the results of the count to the conditions prevalent in August 1986, little probative value, and potential for confusing the jury. While there would probably be more cars on the road in August than March, reducing the interval, Bradley made no showing of how different the time intervals might be. "Questions concerning relevance and materiality rest largely in the trial court's discretion and do not constitute grounds for a new trial or reversal unless abuse is clearly demonstrated." *Sabag v. Continental South Dakota*, 374 N.W.2d 349, 354 (S.D.1985). "[T]he question of whether evidence is immaterial, conjectural or remote must be left to the practical judgment of the trial court and rests largely in its discretion." *State v. McNamara*, 325 N.W.2d 288, 291 (S.D.1982) (citing *Drier v. Perfection, Inc.*, 259 N.W.2d 496 (S.D.1977)). There was no abuse of discretion on this record.

Conviction of premeditated murder affirmed.

WUEST, C.J., and MORGAN and MILLER, JJ., concur.

SABERS, J., concurs in part and dissents in part.

SABERS, Justice (concurring in part and dissenting in part).

I dissent on Issue 1—the rejection of proposed jury instructions concerning accomplice testimony. The majority opinion concedes:

The instructions Bradley proposed correctly reflected the law regarding accomplices, but the question is whether they had any application given the evidence in this case. The trial court decided that there was insufficient evidence for the jury to find Lillegaard to be an accomplice. We agree.

Although Bradley was *not* entitled to have the jury instructed that Lilligaard was an

accomplice as a matter of law, he *was* entitled to have the jury determine that question under his proposed instruction. In this respect, the trial court erred and the majority affirms that error.

There is evidence in this record to enable the jury to reasonably believe that Thunder Hawk was still alive when Lilligaard acted as a lookout while Bradley placed Thunder Hawk in the trunk of the car. More importantly, there is evidence in this record to enable the jury to believe that Lilligaard assisted Bradley much earlier (by acting as a lookout and in holding the door open so Bradley could carry Thunder Hawk into the kitchen). This occurred in the backyard, after Thunder Hawk was struck by Bradley and had fallen backwards and was knocked unconscious against a concrete stairstep. As stated by the majority:

> There was evidence that Bradley stood over Thunder Hawk and kicked her in the ribs with his cowboy boots. Lillegaard, by his own words, held a door open while Bradley carried Thunder Hawk inside the apartment. Bradley then undressed Thunder Hawk and commenced having sexual intercourse with her....

Thunder Hawk revived and struggled and was strangled by Bradley while Lillegaard watched. There was also some testimony that Bradley, Lilligaard, and Davids had intercourse with Thunder Hawk after she was dead. It is possible that Lilligaard was acting as a "good samaritan" and not as an "accomplice" to Bradley in holding the door, but not very probable. It is certainly a question for the jury and not for the court. *State v. Rufener*, 401 N.W.2d 740, 746 (S.D.1987) (Sabers, J., concurring in part and dissenting in part); *State v. Byrum*, 399 N.W.2d 334, 338 (S.D.1987) (Sabers, J., dissenting); *State v. Rufener*, 392 N.W.2d 424, 431 (S.D.1986) (Sabers, J., dissenting); *State v. Dominiack*, 334 N.W. 2d 51 (S.D.1983); *State v. Johnson*, 81 S.D. 600, 139 N.W.2d 232 (1965). Therefore, the trial court committed reversible error in rejecting Bradley's proposed instruction to require the jury to determine whether Lilligaard was an accomplice, and if so, whether his testimony had to be corroborated to sustain Bradley's conviction. SDCL 23A–22–8. In addition, if Lilligaard was an accomplice, the jury had to be instructed that his testimony must be viewed with caution or distrust. *Byrum, supra; Dominiack, supra.*